## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DISTRICT CAPITAL PARTNERS, LLC, | : | |
|    1800 M Street, NW, Suite 550 S | : | Case Number: _____ |
|    Washington, DC 20036 | : | |
|                     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DOUGLAS A. PALMER, JR., | : | |
|    45 Sutton Square SW | : | |
|    Washington, DC 20024 | : | **JURY TRIAL** |
| | : | **DEMANDED** |
| and | : | |
| | : | |
| ASCEND CAPITAL GROUP, LLC, | : | |
|    1775 Tysons Blvd | : | |
|    McLean, VA 22102 | : | |
|             Defendants. | : | October 23, 2019 |

## VERIFIED COMPLAINT

District Capital Partners, LLC, ("Plaintiff"), by their undersigned counsel, Wiggin and Dana LLP, allege upon knowledge with respect to itself and its own actions and upon information and belief as to all other matters as and for its Verified Complaint, against defendants Douglas A. Palmer, Jr. and Ascend Capital Group, LLC ("Defendants"), as follows:

## PARTIES

1.    District Capital Partners, LLC ("DCP") is a Virginia limited liability company with its principal place of business located in the District of Columbia. DCP is a mergers and acquisitions advisory firm competing in the Washington, D.C. metropolitan area market.

2.    Douglas A. Palmer, Jr., is a former DCP employee residing, upon information and belief, in the District of Columbia.

1

3.     Ascend Capital Group, LLC ("Ascend") is a Delaware limited liability company with its principal place of business located in Virginia. Ascend is another mergers and acquisitions advisory firm competing in the Washington, D.C. metropolitan area market.

4.     Mr. Palmer is an officer of Ascend, a Vice-President working at its Virginia office.

## JURISDICTION

5.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1322(a)(1), as causes of action in this case arise under the laws of the United States, because there is diversity of citizenship between DCP and Ascend, and the amount in controversy exceeds $75,000, excluding fees and costs.

## VENUE

6.     Venue is proper under 28 U.S.C. §1391(b)(2), as a substantial part of the events giving rise to DCP's claims occurred in, and a substantial part of property that is the subject of this action was situated in, the District of Columbia.

## FACTUAL ALLEGATIONS

7.     In February 2017, DCP hired Mr. Palmer as an Associate and Mr. Palmer remained an employee of DCP until December 20, 2018. During that time, Mr. Palmer had access to DCP's confidential information and trade secrets, including but not limited to its proprietary client information, contract information, cost information, customer information, employee information, software, supplier information, and information held on behalf of and/or for clients (hereinafter, "DCP's Confidential Information").

8.     As a condition of Mr. Palmer's employment at DCP, he executed an employment offer letter. *See* "Offer Letter," dated February 10, 2017, a true and correct copy of which is attached hereto as Exhibit A and incorporated herein. By countersigning the Offer Letter, Mr.

Palmer agreed that, except as may be required while carrying out his duties in accordance with the Offer Letter, he would not:

> disclose, for the duration of [his] employment or at any time thereafter, any [confidential information] to any person, other than to the directors, officers, employees or agents of DCP that have a need to know such information, [or] use or exploit, directly or indirectly, such information for any purpose other than for the purposes of DCP, [or] disclose or use for any purpose, other than those of DCP or its Affiliates, any other information which [he] may acquire during [his] employment with respect to the business and affairs of DCP or its Affiliates.

Ex. A at § 5.1(a).

9.      During his employment at DCP, Mr. Palmer received special training, and had access to DCP's Confidential Information and proprietary methods, on mergers and acquisitions advisory services.

10.     Mr. Palmer also agreed that he would not, at any time during his employment with DCP and without DCP's prior written consent, "engage in, carry on or otherwise have any interest in, advise, lend money to, guarantee the debts or obligations of, permit [his] name to be used in connection with any business which is competitive to DCP or which provides the same or substantially similar services as DCP." Ex. A at § 5.4(a)(i).

11.     Mr. Palmer likewise agreed in a non-competition clause that he would not act, directly or indirectly:

> for the purpose, or with the effect, of competing with any business of DCP, solicit, interfere with, accept any business from or rendering any services to any client or prospective client of DCP or any Affiliate at the time [he] ceased to be employed by DCP or who was a client during the 12 months immediately preceding such time.

See id. at § 5.4(a)(ii).

3

12.     On December 20, 2018, Mr. Palmer and DCP entered into a Separation Agreement. *See* Separation Agreement, a true and correct copy of which is attached hereto as Exhibit B and incorporated herein.

13.     In conjunction with the Separation Agreement, Mr. Palmer also entered into an Employee Proprietary Information and Inventions Agreement (hereinafter "PIIA"). *See* PIIA, a true and correct copy of which is attached hereto as Exhibit C and incorporated herein.

14.     Like the Offer Letter, the Separation Agreement and PIIA included yet another non-competition clause, and placed strict limitations on Mr. Palmer's ability to share DCP's Confidential Information with third parties:

> Both during and after your employment you acknowledge your continuing obligations under the Proprietary Information, Inventions, Non-Competition and Non-Solicitation Agreement attached to this agreement as Exhibit A (the "PIIA") not to use or disclose any confidential or proprietary information of the Company and to refrain from certain solicitation and competitive activities.

Ex. B at § 7.

15.     In this regard, the PIIA required Mr. Palmer to recognize and not disclose certain proprietary information of DCP, including, but not limited to:

> (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques . . .; and (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, suppliers and customers; and (c) information regarding the skills and compensation of other employees of the Company.

(hereinafter "DCP's Proprietary Information"). Ex. C at § 1.2.

16.     With respect to DCP's Proprietary Information, Mr. Palmer agreed that:

> At all times during and after [his] employment, [he] will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information . . ., except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing . . . I have been informed and acknowledge

4

that the unauthorized taking of the Company's trade secrets may subject me to civil
and/or criminal penalties.

Id. at § 1.1.

17.     The PIIA included still another non-competition clause, and also reaffirmed Mr.

Palmer's duty of loyalty to DCP, under which Mr. Palmer agreed that "during the period of [his]

employment by the Company [he] will not, without the Company's express written consent,

engage in any employment or business activity other than for the Company, including but not

limited to employment or business activity which is competitive with, or would otherwise conflict

with, my employment by the Company." Ex. C. at § 4.

18.     Finally, all three agreements (the Offer Letter, Separation Agreement, and PIIA)

confirmed Mr. Palmer's duty to return all property of DCP upon separation. For example, the Offer

Letter specified that:

> All books, records, and accounts relating in any manner to DCP or to any suppliers,
> customers, or clients of DCP, whether prepared by you or otherwise coming into
> your possession, shall be the exclusive property of DCP and immediately returned
> to DCP upon termination of employment or upon request at any time.

Ex. A at § 6.11. *See also* Ex. B at § 6; Ex. C at § 7.

19.     During the November to December 2018 period in which Mr. Palmer was

subsequently found to be working *sub rosa* for Ascend, he was paid $17,548.07 in salary by DCP.

Prior to his termination, not knowing of his clandestine misconduct, DCP also awarded Mr. Palmer

a discretionary bonus of $120,000, for total compensation by DCP during this period of

$137,548.07.

20.     Beginning in or about the early part of November 2018, Mr. Palmer was involved

in the formation and/or creation of Ascend, a business that competes with DCP in the Washington,

D.C. metropolitan area market.

21.     Following Mr. Palmer's termination, DCP noticed that Ascend's website included elements that directly plagiarized elements of DCP's Confidential and Proprietary Information.

22.     As a result, DCP hired a forensic technology investigator to analyze Mr. Palmer's use of DCP's computer system in November and December 2018, prior to his departure from DCP. That analysis cost more than $5,000 and uncovered the following activities which took place in the District of Columbia.

23.     On November 11, 2018, less than a week after Ascend was incorporated and the Domain "ascendcg.com" was registered, Mr. Palmer conducted internet searches on DCP's computer system using the search terms (i) "the top 50 logos"; (ii) "companies with mountain logos"; and (iii) "to ascend."

24.     DCP was not looking for a new logo at that time and Mr. Palmer's duties and responsibilities did not include choosing logos. Rather, Mr. Palmer, within days of Ascend's incorporation and establishment of its website, was using DCP's computer system to choose a logo for the new company.

25.     On November 12, 2018, Mr. Palmer used DCP's computer system to access "Google Drive" which, upon information and belief, is a cloud-based file storage service. DCP does not use Google Drive, but Ascend, upon information and belief, does use this file storage service. Mr. Palmer was invited to join Ascend's Google Drive while employed with DCP.

26.     On November 14, 2018, Mr. Palmer used DCP's computer system to access his personal email account (djpalmer37@gmail.com) and opened an email that had been forwarded to him with the subject line "S&P Capital IQ Agreement for Ascend Capital Group."

27.     On November 15, 2018, Mr. Palmer used DCP's computer system to access his personal email account and opened an email with the subject line "Welcome to ascendcg.com."

This email was an invitation to join Ascend's email server—which Palmer accepted—giving him access to Ascend's email services while still employed by DCP.

28.     Later that day, Mr. Palmer used DCP's computer system to visit Ascend's website.

29.     On November 16, 2018, Mr. Palmer used DCP's computer system to access his personal email account and opened an email with the subject line "You have been added to a Team Drive: Logo Design."

30.     On November 19, 2018, Mr. Palmer used DCP's computer system to access "My Drive – Google Drive" and "Team Drive" and proceeded to visit shared folders entitled "Logo Design" and "Favorite Logos." These actions confirm that Mr. Palmer was invited to join Ascend's Google Drive, that he accepted the invitation, and helped select its logo while employed by DCP.

31.     On December 11, 2018, Mr. Palmer used DCP's computer system to conduct internet searches using the terms "buy hard drive" and "hard drive."

32.     On December 15, 2018, Mr. Palmer connected an external hard drive, a Western Digital My Passport 25E2 USB Device (S/N: 57587314433385235343146), to DCP's computer system and accessed and copied DCP's highly confidential information contained in the network computer "D:\_DCP" "and "D:\_DCP_" file folders, which contain DCP client files, including specifically DCP's proprietary target lists.

33.     This unauthorized access to DCP's client files and proprietary target lists constituted an unauthorized use of Mr. Palmer's computer system to access restricted, confidential information. The computer files in these folders have independent economic value, and DCP exercised reasonable efforts to maintain their secrecy. The file folders' contents were protected.

34.     Upon information and belief, Mr. Palmer purchased the identified external hard drive between December 11 and December 15, 2018, to unlawfully copy DCP's Confidential and Proprietary Information for Ascend's benefit.

35.     On December 17, 2018, Mr. Palmer again used DCP's computer system to access "My Drive – Google Drive."

36.     On December 18, 2018, Mr. Palmer conducted an internet search using the search term "wipe laptop" and visited a website explaining "(h)ow to wipe all of your data from your Windows 10 PC | BT."

37.     On December 20, 2018, Mr. Palmer was terminated by DCP for poor performance. That same day, Mr. Palmer stated to several DCP colleagues that he was joining a financial advisory business to compete directly against DCP.

38.     Since his termination on December 20, 2018, Mr. Palmer has contacted several of DCP's clients. Mr. Palmer has asked DCP clients for an endorsement quote to use on Ascend's website. However, the DCP clients that were contacted had not ever previously worked with Ascend.

39.     Most recently, on September 12, 2019, a DCP client informed DCP that Mr. Palmer reached out to them to resurrect a proposed deal that the client had abandoned. Mr. Palmer had worked on the opposing side of that abandoned deal while at DCP.

40.     Upon information and belief, Mr. Palmer accessed DCP's trade secret and Confidential and Proprietary Information to assist in the formation and start-up of Ascend, with the prior knowledge of Ascend.

41.     Upon information and belief, Mr. Palmer now serves as Vice President at Ascend.

42.     Upon information and belief, Mr. Palmer provided DCP's trade secret and Confidential and Proprietary Information to Ascend without DCP's permission, and despite DCP sending both Mr. Palmer and Ascend a cease-and-desist letter on March 7, 2019. *See* Cease-and-Desist letter, a true and correct copy of which is attached hereto as Exhibit D and incorporated herein.

43.     Ascend and DCP are direct competitors, both providing similar and overlapping merger and acquisition financial advisory services in the Washington, D.C. metropolitan area.

44.     Mr. Palmer and Ascend remain in possession of DCP's trade secrets and Confidential and Proprietary information.

45.     Mr. Palmer and Ascend have misappropriated and are using trade secrets and Proprietary and Confidential Information stolen from DCP in their current operations.

46.     Mr. Palmer and Ascend are jointly and severally liable for the following District of Columbia, federal, and common law causes of action because of their willful and malicious misconduct.

## CAUSES OF ACTION

### Count One: Mr. Palmer and Ascend: Trade Secret Misappropriation Under D.C. Code §§ 36-401 to 405

47.     DCP incorporates each of the preceding paragraphs as if fully set forth in this paragraph.

48.     Under the terms of Section 401, the contents of DCP's shared drives have independent economic value and DCP exercised reasonable efforts to maintain their secrecy. The shared drives' contents were protected, and not generally known to or readily ascertainable by others through proper means.

49.    Indeed, Mr. Palmer knew that DCP's shared drives contained DCP's trade secrets and Confidential and Proprietary Information, including DCP's proprietary business methods, processes and techniques, customer information, and proprietary target lists.

50.    The data on DCP's shared drives are trade secrets of DCP.

51.    Mr. Palmer and Ascend knowingly misappropriated DCP's trade secrets through improper means, specifically, Mr. Palmer's theft by electronic espionage, in breach of his contractual duties to maintain DCP's trade secrets and Confidential and Proprietary Information by copying all of DCP's data from its shared drives without permission or authorization.

52.    Ascend was aware of Mr. Palmer's breach of his covenants as Mr. Palmer disclosed DCP's trade secrets to Ascend.

53.    Mr. Palmer knew and Ascend knew, or should have known, that the data Mr. Palmer copied from DCP and shared with Ascend included DCP's trade-secrets, and Confidential and Proprietary Information.

54.    Thus, Mr. Palmer and Ascend (1) acquired DCP's trade secrets through improper means (the unauthorized access and copying of DCP's data); (2) knew that that data constituted trade secrets; and (3) was acquired and disclosed in violation of Mr. Palmer's covenants to DCP, which required Mr. Palmer to maintain the secrecy of that data.

55.    As such, Defendants' misconduct violated the law prohibiting misappropriation of trade secrets which prohibits the acquisition of trade secrets by improper means, or improper use or disclosure by one under a duty not to disclose.

56.    Section 402 allows this Court to order affirmative acts to protect DCP's trade secrets from further misappropriation by Mr. Palmer and Ascend.

57.     Section 403 allows this Court to award DCP damages for the actual loss caused by Mr. Palmer and Ascend's trade secret misappropriation, and any unjust enrichment caused by their misappropriation not considered in computing DCP's actual loss, and in cases of willful and malicious misappropriation, double damages.

58.     Section 404 allows this Court to award DCP's reasonable attorney's fees based on Mr. Palmer and Ascend's willful and malicious misappropriation.

59.     Section 405 allows this Court to, *inter alia*, order Mr. Palmer and Ascend to not further disclose DCP's trade secrets without the Court's prior approval.

60.     DCP has no adequate remedy at law in that the damages set forth above cannot be compensated in monetary damages.

61.     The Defendants' misconduct as set forth above has caused and will continue to cause DCP irreparable harm in that DCP has lost control of its trade secrets and Confidential and Proprietary Information and that information has been provided to and is being used by a competitor.

### Count Two: Mr. Palmer and Ascend: Trade Secret Misappropriation Under 18 U.S.C. §§ 1832(a) and 1836(b)(3)(A)-(C)

62.     DCP incorporates each of the preceding paragraphs as if fully set forth in this paragraph.

63.     Mr. Palmer and Ascend conspired with the intent to convert DCP's trade secrets, and Confidential and Proprietary Information, which are used in interstate commerce, for his and Ascend's economic benefit, intending and knowing that this would injure DCP.

64.     Mr. Palmer stole by computer fraud, and carried away duplicates of, DCP's files including its client and target lists, which were received and are possessed by Ascend.

65.     Mr. Palmer and Ascend have derived and continue to improperly derive economic benefit from their theft of DCP's trade secrets, and, in so doing, deprive DCP of the benefits it is rightfully entitled to derive from its now-stolen trade secrets.

66.     Thus, Defendants' scheme to steal and exploit DCP's trade secrets violated Section 1832 and its prohibition against the theft of trade secrets.

67.     Section 1836 further provides for private, federal civil actions with respect to the misappropriation of trade secrets.

68.     Section 1836 allows this Court to grant injunctions to prevent Mr. Palmer and Ascend's actual and further threatened misappropriation of DCP's trade secrets, including requiring from Mr. Palmer and Ascend affirmative acts to be taken to protect DCP's trade secrets.

69.     Section 1836 further allows this Court to award DCP damages for actual losses caused by their misappropriation, including unjust enrichment—and again, in cases of willful and malicious misappropriation, double damages.

70.     DCP has no adequate remedy at law in that the damages set forth above cannot be compensated in monetary damages.

71.     The Defendants' misconduct as set forth above has caused and will continue to cause DCP irreparable harm in that DCP has lost control of its trade secrets and Confidential and Proprietary Information, and that information has been provided to and is being used by a competitor, Ascend.

**Count Three: Mr. Palmer: Computer Fraud Under 18 U.S.C. § 1030**

72.     DCP incorporates each of the preceding paragraphs as if fully set forth in this paragraph.

73.     As part of his scheme to steal and convert DCP's trade secrets, Mr. Palmer intentionally accessed DCP's computer systems, knowing that they were used in or affected interstate commerce and communication.

74.     Mr. Palmer also knowingly and intentionally accessed DCP's computer systems without authorization and in excess of any authorization to copy DCP's trade secrets and other data from its shared drives.

75.     Indeed, Mr. Palmer exfiltrated, and thereby obtained, information, including DCP's data stored on those shared drives through his unauthorized access to DCP's computer systems.

76.     Moreover, Mr. Palmer knew, or reasonably should have known, that the acquisition and subsequent disclosure of this data would and, in fact, did cause damage and loss to DCP.

77.     Under the terms of Section 1030(a)(4), Mr. Palmer knowingly, and with the intent to defraud, accessed DCP's shared drive in excess of his authorization. Mr. Palmer did so to copy and remove DCP computer files, including its trade secrets and Confidential and Proprietary Information. Mr. Palmer brought them to Ascend, causing DCP a loss in excess of $5,000 in computer forensic and legal fees alone, and lost revenue in an amount to be determined.

78.     DCP's shared drive is used in and affects interstate commerce and communication. *See* Section 1030(e)(2)(b).

79.     Section 1030(g) allows this Court to award DCP compensatory economic damages and injunctive and equitable relief to DCP for Mr. Palmer's computer fraud, undertaken with the knowledge of Ascend.

### Count Four: Mr. Palmer: Breach of Contract at Common Law

80.     DCP incorporates each of the preceding paragraphs as if fully set forth in this paragraph.

81.     The common elements of a breach of contract in the District of Columbia, as well as Delaware and Virginia, are the existence of a valid contract between two parties, the breach of a duty of obligation in that contract, and damages suffered because of that breach.

82.     Mr. Palmer breached enforceable contracts with DCP regarding his obligations of confidentiality and non-disclosure, non-competition, non-disclosure, non-solicitation, and records-keeping, causing damages to DCP. He violated his obligations to:

a.      Keep confidential, and not disclose or exploit for his or another's purposes, DCP's trade secrets or confidential or proprietary information;

b.      To not engage in any business activity other than for DCP, and specifically not for any business competitive with and providing similar services as DCP;

c.      To not solicit any client or prospective client of DCP until at least January 19, 2020; and

d.      To return all property to DCP upon his separation.

83.     Mr. Palmer's breaches of the non-competition clauses of his Offer Letter, Separation Agreement, and PIIA are among the most flagrant. He contracted in his Offer Letter to not act, directly or indirectly, for the purpose or with the effect of, competing with any business of DCP, and to not solicit, interfere with, or accept any business from or render any services to any client or prospective client of DCP or its affiliates until at least January 19, 2020.

84.     Mr. Palmer further contracted in his Separation Agreement not to use or disclose any of DCP's Confidential or Proprietary Information, and to refrain from solicitation and competitive activities.

85.     The PIIA included still another non-competition clause, also reaffirmed Mr. Palmer's duty of loyalty to DCP, under which Mr. Palmer agreed that "during the period of [his]

employment by the Company [he] will not, without the Company's express written consent, engage in any employment or business activity other than for the Company, including but not limited to employment or business activity which is competitive with, or would otherwise conflict with, my employment by the Company."

86. Because of Mr. Palmer's breaches, DCP has suffered actual damages including, without limitation, costs incurred in engaging computer forensics experts and attorney's fees associated with protecting DCP's trade secrets and Confidential and Proprietary Information, and lost revenue in an amount to be determined.

87. DCP has no adequate remedy at law in that the damages set forth above cannot be compensated in monetary damages.

88. The Defendants' misconduct as set forth above has caused and will continue to cause DCP irreparable harm in that DCP's trade secrets and Confidential and Proprietary Information were misappropriated, and that information has been provided to and is being used by a competitor.

### Count Five: Ascend: Tortious Interference with Contract at Common Law

89. DCP incorporates each of the preceding paragraphs as if fully set forth in this paragraph.

90. The common elements of tortious interference with contract in the District of Columbia, as well as Delaware and Virginia, are the existence of a valid contract, the defendant's knowledge of the existence of that contract, an intentional (and in Delaware, unjustifiable) act to interfere with that contract and procure its breach, and damages to the plaintiff.

91.     Upon information and belief, Ascend's corporate officers, close friends of Mr. Palmer, knew of the existence of his employment contract with DCP, and the covenants contained therein.

92.     Beginning the day after Ascend's incorporation, between November 12-19, 2018, while Mr. Palmer was still an employee of DCP, in a series of emails Ascend invited him to join Ascend's Google Drive, welcomed him to Ascend, provided him with an ascend.com email address, and added him to Ascend's team drive for logo design.

93.     On December 15, 2018, Ascend's clandestine source and employee Mr. Palmer committed electronic espionage through his theft of DCP's client files. On December 20, 2018, Mr. Palmer announced to DCP colleagues that he was joining a competitor firm, Ascend. Mr. Palmer has since contacted and solicited DCP's clients on behalf of Ascend.

94.     Ascend intentionally (and unjustifiably) procured Mr. Palmer's breach of that contract, causing damages to DCP.

95.     Because of Ascend's tortious interference with Mr. Palmer's contracts with DCP, DCP has suffered damages including, without limitation, costs incurred in engaging computer forensics experts and attorney's fees associated with protecting DCP's trade secrets, and Confidential and Proprietary Information, and lost revenue as well.

96.     DCP has no adequate remedy at law in that the damages set forth above cannot be compensated in monetary damages.

97.     The Defendants' misconduct as set forth above has caused and will continue to cause DCP irreparable harm in that DCP's trade secrets and Confidential and Proprietary Information have been misappropriated, and that information has been provided to and is being used by a competitor.

## Count Six: Mr. Palmer and Ascend: Unjust Enrichment at Common Law

98.     DCP incorporates each of the preceding paragraphs as if fully set forth in this paragraph.

99.     The common elements of unjust enrichment in the District of Columbia, as well as Delaware and Virginia, are that a defendant was enriched as the direct result of a plaintiff's impoverishment, without justification, and in unconscionable circumstances that demand restitution, but which deny another clear remedy at law—Virginia adding the additional element of the defendant's knowledge.

100.    Mr. Palmer and Ascend unconscionably benefitted from the unjustified misappropriation and use of DCP's trade secrets and Confidential and Proprietary Information, as well as from the breach of Mr. Palmer's covenants to DCP. In equity and good conscience, Ascend should not have used DCP's trade secrets or proprietary information nor should they have reaped any benefit from Mr. Palmer's breach of his covenants to DCP. Mr. Palmer and Ascend have unjustly not compensated DCP for these benefits, to DCP's detriment.

101.    Mr. Palmer unconscionably benefitted from a discretionary bonus in the amount of $120,000 that DCP paid to Mr. Palmer prior to his termination. DCP awarded Mr. Palmer this bonus without knowledge of his clandestine misconduct. If DCP knew at that time that Mr. Palmer was misappropriating DCP's Confidential and Proprietary Information, DCP would not have awarded this discretionary bonus to Mr. Palmer. Mr. Palmer should not be enriched to DCP's detriment because Mr. Palmer was able to conceal his unconscionable acts long enough to deceive DCP into giving him a bonus.

102.    DCP has no adequate remedy at law in that the damages set forth above cannot be compensated in monetary damages.

103. The Defendants' misconduct as set forth above has caused and will continue to cause DCP irreparable harm in that DCP's proprietary information has been misappropriated, and that information has been provided to and is being used by a competitor.

### Count Seven: Mr. Palmer and Ascend: Civil Conspiracy at Common Law

104. DCP incorporates each of the preceding paragraphs as if fully set forth in this paragraph.

105. The common elements of civil conspiracy in the District of Columbia, as well as Delaware and Virginia, are an agreement between at least two persons to take unlawful or tortious action to accomplish an illegal act, resulting in damages.

106. In furtherance of the scheme as described above, Mr. Palmer and Ascend have been and remain engaged in a conspiracy and course of misconduct to break Mr. Palmer's contractual promises to DCP, to deprive DCP of the benefit of its bargains under those agreements, to mask Mr. Palmer's cooperation with and contributions toward Ascend, to compete directly with DCP, to misappropriate and exploit DCP's trade secrets, Confidential and Proprietary Information, goodwill and other valuable assets, and to deprive DCP of significant actual and prospective revenue, profits, customers, goodwill and market growth opportunities.

107. Mr. Palmer and Ascend, acting in combination, misappropriated through computer fraud DCP's trade secrets, and Confidential and Proprietary Information, and caused the breach of Mr. Palmer's covenants to DCP, placing at risk DCP's goodwill in the marketplace and other valuable assets.

108. DCP has no adequate remedy at law in that the damages set forth above cannot be compensated in monetary damages.

109.    The Defendants' misconduct as set forth above has caused and will continue to cause DCP irreparable harm, in that DCP's trade secrets, and Confidential and Proprietary Information have been misappropriated, and that information has been provided to and is being used by a competitor.

## PRAYER FOR RELIEF

*Wherefore*, DCP requests:

A.  An Order compelling both Mr. Palmer and Ascend to return all copies and derivatives of trade secrets, and Confidential and Proprietary Information, and any other documents copied from DCP's computer network;

B.  A preliminary and permanent injunction related to both the actual and threatened losses suffered by DCP, including an Order precluding Mr. Palmer, Ascend, their agents, servants, employees and attorneys, and all others in active concert or participation from using any information contained in the trade secrets, and Confidential and Proprietary Information, and any documents copied from DCP's shared drives;

C.  A preliminary and permanent injunction enjoining Mr. Palmer from taking any act, for the purpose of, or with the effect, of competing with any business of DCP, soliciting, interfering with, accepting any business from or rendering any services to any client or prospective client of DCP or any affiliate;

D.  Actual compensatory damages suffered by DCP, including $137,548.07, as the disgorgement of Mr. Palmer's unjust enrichment through his compensation by DCP, during the period when he was clandestinely working on behalf of Ascend;

E.  Exemplary and punitive damages, given the willful and malicious nature of the misconduct by Mr. Palmer and Ascend, in an amount to be determined;

F.  Attorney's fees, again given the willful and malicious nature of the misconduct;

G.  Computer forensic fees;

H.  Entry of an order of specific performance requiring Mr. Palmer to abide by his covenants to DCP;

I.   An accounting by Mr. Palmer and Ascend of the profits to which DCP may be entitled;

J.   Pre-judgment and post-judgment interest;

K. Declaratory judgment that Mr. Palmer's access to and copying of DCP's propriety data was unauthorized and illegal and that the Defendants have no lawful right to own, control or possess that data; and

L. Such other and further relief as the Court deems just and equitable.

By:

Kevin T. Carroll (DC 1020479)
Wiggin and Dana LLP
800 17th Street, Northwest, Suite 520
Washington, DC 20006
kcarroll@wiggin.com
Phone: 202-800-2475
Facsimile: 212-551-2888

David L. Hall (DC 1033996)
Wiggin and Dana LLP
Two Liberty Place
50 South 16th Street, Suite 2925
Philadelphia, Pennsylvania 19102
dhall@wiggin.com
Phone: 215-988-8325
Facsimile: 215-988-8344

Kenneth K. Cho (DC 438783)
Wiggin and Dana LLP
437 Madison Avenue, 35th Floor
New York, New York 10022
kcho@wiggin.com
Phone: 212-551-2613
Facsimile: 212-551-2888

<u>VERIFICATION</u>

I, Matthew P. Lynch, hereby certify on behalf of District Capital Partners, LLC that I have reviewed the above Verified Complaint and that the factual statements contained therein concerning District Capital Partners LLC and its activities are true and accurate to the best of my knowledge and belief, and based on a review of the business records of District Capital Partners LLC, and declare under penalty of perjury (28 U.S.C. § 1746) that the foregoing statement is true and correct.

Executed on October 23, 2019.

_____
Matthew P. Lynch
Managing Director
District Capital Partners

21