## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ : | |
| DISTRICT CAPITAL PARTNERS, LLC, : | |
|  1800 M Street, NW, Suite 550 S : | Case no.: 19-cv-3183-JEB |
|  Washington, DC 20036 : | |
|  Plaintiff, : | |
| : | |
| v. : | |
| : | |
| DOUGLAS A. PALMER, JR., : | |
|  45 Sutton Square SW : | |
|  Washington, DC 20024 : | **JURY TRIAL** |
| : | **DEMANDED** |
| and : | |
| : | |
| ASCEND CAPITAL GROUP, LLC, : | |
|  1775 Tyson Blvd : | |
|  McLean, VA 22102 : | |
|  Defendants. : | |

## MEMORANDUM OF LAW
## IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION AND OTHER RELIEF</u>

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ............................................................................................... 1

II.  FACTUAL BACKGROUND ............................................................................ 2

    A.  DCP's Trade-Secrets, Proprietary Business, Methods and Systems. ...................... 2

    B.  Mr. Palmer's Covenants to DCP in the Offer Letter ................................. 5

    C.  Mr. Palmer has access to DCP's Proprietary Information and Trade Secrets .......... 6

    D.  Mr. Palmer Agrees to Additional Covenants to DCP in the Severance Agreement and the PHA ................................................................................. 7

    E.  Defendants Establish a Competing Business ........................................... 9

    F.  Mr. Palmer's Departure from DCP and Theft of its Proprietary Information ........ 11

    G.  Defendants Use DCP's Trade Secrets and Target DCP's Customers.................... 12

III.  LEGAL STANDARD........................................................................................ 14

IV.  LEGAL ARGUMENT....................................................................................... 14

    A.  DCP is Entitled to Injunctive Relief for its Claims for Misappropriation of its Trade Secrets and Breach of the Restrictive Covenants to DCP .......................... 15

        a.  DCP is Likely to Succeed on its Claim for Misappropriation of Trade Secrets ..................................................................................... 15

            1.  DCP's Trade Secrets ................................................................. 15

            2.  Palmer Improperly Copies and Removed DCP's Trade Secrets .................. 16

        b.  DCP is Likely to Succeed on its Claim for Breach of the Restrictive Covenants ................................................................................ 16

            1.  DCP has demonstrated of a likelihood of success for breach of the covenants of confidentiality ....................................................... 17

        c.  These Breaches have caused irreparable harm to DCP. .................................. 19

        d.  The Balancing of the Resulting Harm Favors DCP.......................................... 21

        e.  The Public Interest Favors Issuing an Injunction ........................................ 23

        V.  CONCLUSION........................................................................................ 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABA, Inc. v. District of Columbia,*
40 F. Supp.3d 153 (D.D.C. 2014)……………………………………………………18

*Blue Ridge Anesthesia v. Gidick,*
389 S.E.2d 467 (1990) ……………………………………………………………… 21

*Council on Am.–Islamic Relations v. Gaubatz,*
667 F. Supp.2d 67 (D.D.C. 2009) ................................................................. 25

*Davis v. Billington,*
76 F. Supp.3d 59 (D.D.C. 2014) ................................................................. 18

*Davis v. Pension Benefit Guar. Corp.,*
571 F.3d 1288 (D.C. Cir. 2009) ................................................................. 18

*DSMC, Inc. v. Convera Corp.,*
479 F. Supp. 2d 68 (D.D.C. 2007) ................................................................. 19

*Eden Hannon & Co. v. Sumitomo Trust & Banking Co.,*
914 F.2d 556 (4th. Cir. 1990) ................................................................. 22, 23

*Hosp. Staffing Sols., LLC v. Reyes,*
736 F. Supp. 2d 192 (D.D.C. 2010) ........................................................... 20, 23, 24, 27

*Human Touch DC, Inc. v. Merriweather,*
No. 15-CV-00741 (APM), 2015 WL 12564162 (D.D.C. May 18, 2015) ...................... 24

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schulz,*
No. 01-0402, 2001 WL 1681973 (D.D.C. Feb. 26, 2001)................................. 23

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz,*
298 F. Supp. 2d 27 (D.D.C. 2002) ................................................... 20, 21, 26

*Morgan Stanley DW Inc. v. Rothe,*
150 F. Supp. 2d 67 (D.D.C. 2001) ........................................................ 19, 23, 24, 27

*Nat'l Elevator Cab & Door Corp. v. H&B, Inc.,*
282 Fed. Appx. 885, 887 (2d Cir, 2008) ...................................................... 24

i

*Nat'l Legal Research Grp. v. Lathan*,
No. CIV. A. 92-0031-C, 1993 WL 169789 (W.D. Va. May 17, 1993), *aff'd,
sub nom. Nat'l Legal Research Grp., Inc. v. Lathan*, 42 F.3d 1386 (4th Cir.
1994) .................................................................................................................. 21

*Northern Mariana Islands v. United States*,
686 F. Supp. 2d 7 (D.D.C. 2009) .................................................................. 18

*Reg Seneca, LLC v. Harden*,
938 F. Supp.2d 852 (S.D. Iowa 2013)……………………….…………… .................. 26

*Robert Half Int'l Inc. v. Billingham*,
315 F. Supp. 3d 419 (D.D.C. 2018) ........................................................ 18, 26

*Texas Children's Hosp. v. Burwell*,
76 F. Supp. 3d 224 (D.D.C. 2014) ................................................................ 18

*Ulloa v. QSP, Inc.*,
271 Va. 72, 624 S.E.2d 43 (2006)................................................................. 21

*Winter v. NRDC*,
555 U.S. 7 (2008) .......................................................................................... 18

**Statutes**

15 U.S.C. § 1116(a) ............................................................................................ 18

D.C. Code § 36-401 ........................................................................................... 19

**Rules**

Federal Rule of Civil Procedure 65(a) ............................................................... 18

I.     **INTRODUCTION**

Plaintiff District Capital Partners, LLC ("DCP") is an advisory firm specializing in mergers and acquisitions ("M&A") in the Washington D.C. metropolitan area market.  From February 10, 2017 to December 20, 2018, DCP employed Defendant Douglas A. Palmer, Jr. as an Associate assisting with the provision of M&A advisory services relating to DCP's clients.  In that capacity, Mr. Palmer was provided with special training and access to DCP's confidential information, proprietary methods and client information as part of his employment with DCP.

Mr. Palmer's employment was conditioned on his agreement that he would maintain the confidentiality of DCP's confidential information and always act in the best interests of DCP. Mr. Palmer also agreed that he would not divert business opportunities away from DCP and would not "engage in, carry on or otherwise have any interest in, [or] advise … any business which is competitive to DCP or which provides the same or substantially similar services as DCP" and would not "solicit, interfere with, accept any business from or render any service to anyone who is a client or a prospective client of DCP or any Affiliate at the time you ceased to be employed by DCP or who was a client during the 12 months immediately preceding such time."  Indeed, when DCP hired Mr. Palmer, trained him, and gave him access to its trade secrets and proprietary information it only did so because Mr. Palmer had given the company his word that he would protect the confidentiality of that information and act in DCP's best interests.

Mr. Palmer broke each of these promises less than two years after he began working at DCP, by creating a directly competing business, Defendant Ascend Capital Group ("Ascend"), his current employer, stealing electronic files used in DCP's operations, including DCP's proprietary business information and trade secrets, using that information in direct competition against DCP, and soliciting DCP's customers and counterparties to Ascend.

Remarkably, upon his departure from DCP on December 20, 2018, Mr. Palmer agreed to supplemental covenants with DCP which included additional prohibitions on the use and disclosure of DCP's information and non-compete, non-solicitation covenants, despite having been engaged in a scheme to misappropriate DCP's trade secrets and proprietary information for use in competition with DCP for at least a month.  But, at that point it was too late; Mr. Palmer knowingly had breached the in-term covenants of his offer letter and was already breaching all of the covenants he agreed to as part of his severance from DCP.

Now, Mr. Palmer and Ascend are using DCP's proprietary information in direct violation and breach of Mr. Palmer's covenants.  Meanwhile, DCP has suffered and continues to suffer from the theft and misuse of its confidential information.  Defendants' blatant disregard for both Mr. Palmer's contractual obligations and DCP's trade secret rights requires immediate injunctive relief to remedy the irreparable harm DCP has suffered and continues to suffer as a result of Defendants' conduct.

## II.   FACTUAL BACKGROUND

### A. DCP's Trade-Secrets, Proprietary Business, Methods and Systems.

DCP is an advisory firm specializing in M&A. October 25, 2019, Declaration of Matthew Lynch, DCP Managing Director ("Lynch Decl.") at ¶ 5. DCP distinguishes itself from the competition by providing scalable, bespoke solutions to assist clients through the M&A process. Unlike the traditional investment banking model, DCP provides an "in-house" perspective by integrating more directly with their clients' existing teams.  In order to provide these services, DCP has developed highly desirable and marketable processes, standards, data, methods, techniques, client information, contract information, cost information, customer information, employee information, software and supplier information (collectively the "Proprietary

Information"), through years of experience, which are specifically designed to provide these advisory services. *Id*. at ¶ 6.

These specially developed techniques and methods have helped DCP achieve a reputation and goodwill in the M&A industry. *Id*. at ¶ 7.  By way of specific example, the Proprietary Information includes customer and target lists of potential acquisition candidates, M&A trackers, proprietary templates and the like.  *Id*. at ¶ 8.

The unique nature of the Proprietary Information gives DCP a competitive advantage in the marketplace which distinguishes it from its competitors. *Id*. at ¶ 11. Thus, it is critical to DCP's business that the Proprietary Information remain confidential. *Id*. Similarly, during the course of its business DCP is provided with sensitive client information, including non-public financial information, suppliers and vendors to the client, as well as sensitive business information that is specific to the client's industry (collectively the "Client Information"). *Id*. at ¶ 12. In the fast moving, secretive world of corporate M&A, the identity of potential acquisition targets is a closely held secret since premature disclosure can have devastating effects such as tipping off competing acquirers or revealing that a potential target is looking for a sale.   In an M&A transaction, most, if not all, Client Information is confidential and includes the identity of the client, M&A targets, outstanding debt, receivables, and prices.  Maintaining the confidentiality of Client Information is integral to DCP's business model, as the disclosure of client information would damage its standing with the client and in the marketplace, and DCP's ability to attract future projects. *Id*. at ¶ 13.

DCP employs a variety of methods to protect the confidentiality of its Proprietary Information and Client Information.  Each employee has a unique email account and network access which is password protected and designed so that other employees or third parties cannot

access another employee's email or computer work space. *Id*. at ¶ 15. Additionally, certain employees are granted restricted access to certain areas such as human resources, legal and finance. *Id*. While DCP expends substantial effort and expense to maintain the confidentiality of its Proprietary Information and Client Information, DCP's business requires that certain trusted DCP employees have access to that Information. *Id*. at ¶ 16.

DCP's Associates are the "work horses" who are tasked with producing detailed financial analyses, corporate valuation, M&A transaction and combination modeling, interpreting industry trends, preparing new business pitch materials, and interacting with senior DCP professionals and client partners to support DCP's activities.  Thus, DCP's Associates are given specialized training on how to employ DCP's Proprietary Information and support this fast moving and confidential process. *Id*. at ¶ 18.  DCP's Associates are similarly given access to very sensitive Client Information and DCP's Proprietary Information as a necessary part of performing their work for DCP. *Id*. at ¶ 19.  Indeed, having highly skilled and knowledgeable Associates able to employ DCP's confidential business techniques and methods is essential to DCP's business model.

As a necessary precaution to prevent any unauthorized use or disclosure and the accompanying harm to DCP and its clients that unauthorized use and disclosure of DCP's Proprietary Information and/or Client Information would cause, DCP conditions employment—and access to its Proprietary Information—on its employees' covenants, promises and professional obligations not to (1) disclose or use any of DCP's Proprietary Information; (2) take any action that could compete with DCP; and (3) solicit any current or prospective client of DCP. *Id*. at ¶ 20.  Indeed, given the extensive training, trust and access to Proprietary Information and Client Information provided by DCP to its Associates, any involvement by a

current or former DCP Associate, who left within one year, in a competing firm would inevitably lead to disclosure and use of some of DCP's Proprietary Information or Client Information on contemporaneous M&A transactions to the benefit of that competitor and to DCP's grave detriment.

### B.  Mr. Palmer's Covenants to DCP in the Offer Letter

Mr. Palmer joined DCP as an Associate on February 10, 2017. As part of the onboarding process, Mr. Palmer was provided with information about his job responsibilities, DCP's business model, and its relationship with clients.  During his employment, Palmer was trained on the importance of maintaining the confidentiality of DCP's Proprietary Information as evidenced by his signature on certain employment documents.  Throughout Mr. Palmer's employment, DCP continued to emphasize the importance of protecting its confidential information since the premature disclosure of an acquisition target or suitor could damage the deal.

Indeed, as a condition of Mr. Palmer's employment at DCP, he executed an employment offer letter (the "Employment Agreement"). *Id*. at Exhibit A. In the Employment Agreement, Mr. Palmer agreed that, except as may be required while carrying out his duties as an Associate for DCP, he would not:

> disclose, for the duration of [his] employment or at any time thereafter, any [Proprietary Information] to any person, other than to the directors, officers, employees or agents of DCP that have a need to know such information, [or] use or exploit, directly or indirectly, such information for any purpose other than for the purposes of DCP, [or] disclose or use for any purpose, other than those of DCP or its Affiliates, any other information which [he] may acquire during [his] employment with respect to the business and affairs of DCP or its Affiliates.

*Id*. at § 5.1(a).

In addition to agreeing not to disclose DCP's Proprietary Information, Mr. Palmer further agreed that, upon his departure from DCP he would turn over all "books, records and accounts

relating in any manner to DCP or to any suppliers, customers or clients of DCP." Moreover, Mr. Palmer specifically agreed that such information is "the exclusive property of DCP." *Id*. at § 6.11.

Mr. Palmer likewise agreed in a non-competition clause that he would not act, directly or indirectly:

> for the purpose, or with the effect, of competing with any business of DCP, solicit, interfere with, accept any business from or rendering any services to any client or prospective client of DCP or any Affiliate at the time [he] ceased to be employed by DCP or who was a client during the 12 months immediately preceding such time.

*Id*.. at § 5.4(a)(ii).

Thus, from the moment that Palmer first began his work at DCP, the importance of maintaining the Confidentiality of DCP's Proprietary Information and the Client information was made unequivocally clear—indeed, agreeing to maintain the confidentiality of that information was a condition precedent to his employment

**C.  Mr. Palmer has access to DCP's Proprietary Information and Trade Secrets.**

Mr. Palmer was a DCP Associate from February 10, 2017, until his termination on December 20, 2018.  After joining DCP, Mr. Palmer received specialized training on DCP's proprietary methods and systems. Lynch Decl. at ¶¶ 18, 22. As part of his work at DCP, Mr. Palmer was provided access to DCP's Proprietary Information and to DCP's Client Information.  Indeed, Mr. Palmer's work required that he access such information in order to perform his job and support the M&A activities of DCP's clients.  *Id*. at ¶ 22.  During his time at DCP, Mr. Palmer worked for several of DCP's high profile clients, each of which had approximately two to five active projects at any given moment, and accessed DCP's Proprietary Information and Client Information to fulfill his duties on those projects.

Mr. Palmer also regularly attended team meetings and strategized with his DCP colleagues—
both in his business unit and in other units—in order to satisfy his duties as an Associate, and to
assist others in accomplishing theirs, thus, Mr. Palmer received a full understanding of DCP's
entire business and the its related methods. *Id*. at ¶ 28. Moreover, Mr. Palmer was also
responsible for developing, obtaining, maintaining and expanding DCP's business relationships
with new and existing customers. *Id*. at ¶ 29. In that capacity, Mr. Palmer had access to and
utilized DCP's Proprietary Information including market research and target analysis as well as
DCP's reputation in the marketplace, relationship with customers and goodwill. *Id*. at ¶ 30. Mr.
Palmer worked collaboratively with other DCP employees in those business development
endeavors and received training and guidance on how best to execute them. *Id*. at ¶ 32.

Mr. Palmer also regularly received reports containing DCP's Proprietary Information
including confidential business statistics, figures, metrics, goals, pricing, fee information and
projections describing the state of DCP's business in real-time, providing analysis and context
for that business and forward-looking expectations and strategies. *Id*. at ¶ 33. Mr. Palmer had a
duty and obligation to maintain the confidentiality of DCP's Proprietary Information and the
Client Information and avoid misusing it. *Id*. at ¶ 34.

**D. Mr. Palmer Agrees to Additional Covenants to DCP in the Severance Agreement and the PIIA.**

Mr. Palmer was terminated for poor performance on December 20, 2018. *Id*. at ¶ 37. At that
time, Mr. Palmer agreed to additional covenants to DCP in a Severance Agreement and in a
Proprietary Information and Inventions Agreement (hereinafter "PIIA"). *Id*. Those covenants
were in addition to those in Mr. Palmer's Employment Agreement and were also intended to
protect DCP against the misappropriation, disclosure and/or use of DCP's Proprietary
Information and Client Information. In the Severance Agreement, Mr. Palmer agreed to "return

to the Company all Company documents (and all copies of Company documents) and other

Company property that you have had in your possession at any time."

Like the Offer Letter, the Separation Agreement and PIIA included yet another non-disclosure

clause, and placed strict limitations on Mr. Palmer's ability to share DCP's confidential

information with third parties:

> Both during and after your employment you acknowledge your continuing
> obligations under the Proprietary Information, Inventions, Non-Competition and
> Non-Solicitation Agreement attached to this agreement as Exhibit A (the "PIIA")
> not to use or disclose any confidential or proprietary information of the Company
> and to refrain from certain solicitation and competitive activities.

*Id*. at Exhibit B, § 7.

In the PIIA Mr. Palmer agreed to "hold in strictest confidence" and not "disclose, use, lecture

upon or publish any of the Company's Proprietary Information."  *Id*. at Exhibit C, § 1.1.  Mr.

Palmer further agreed that, if he were no longer employed by DCP he would "deliver to the

Company any and all property…and all drawings, notes, memoranda, specifications, devices,

formulas, and documents, together with all copies thereof, and any other material containing or

disclosing any Company Inventions, Third Party Information or Proprietary Information of the

Company."  *Id*. at Exhibit C, § 5.  These additional covenants were intended to provide further

assurance that DCP's Proprietary Information and Client Information would be protected and not

disclosed.  In addition to these non-disclosure related covenants, the PIIA also included a

covenant not to compete, which prohibited Mr. Palmer from "solicit[ing] any consultant,

contractor, or customer of the Company, with whom I had contact or whose identity I learned as

a result of my employment with the Company to diminish or materially alter its relationship with

the Company."  *Id*.at Exhibit C, § 5.

Mr. Palmer also explicitly acknowledged that he has had access to DCP's Proprietary Information and further agreed that violation of the PIIA would cause irreparable harm to DCP. *Id*. ("I understand that because of this the Company may sustain irreparable injury if I violate this Agreement.")  To mitigate that harm, Mr. Palmer agreed that DCP would be permitted to seek an "injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies" to prevent the harm that would arise out of the disclosure or misuse of DCP's Proprietary Information and/or Client Information.  In exchange for these covenants, Mr. Palmer and DCP entered into a non-disparagement agreement, which was included in the Severance Agreement.  Thus, when Mr. Palmer signed the Separation Agreement, DCP had no reason to suspect that he had already begun planning to leave for a newly created competitor, and steal and misuse DCP's Proprietary Information in the process. Lynch Decl. at ¶ 38.

**E.  Defendants Establish a Competing Business.**

Beginning in or about the early part of November 2018, Mr. Palmer was involved in the formation and/or creation of Ascend, a business that competes with DCP in the Washington metropolitan area market. *Id*. at ¶ 48. On November 11, 2018—less than a week after Ascend was incorporated and the Domain "ascendcg.com" was registered—Mr. Palmer conducted internet searches on DCP's computer system using the following search terms: (i) "the top 50 logos"; (ii) "companies with mountain logos"; and (iii) "to ascend." *Id*. at ¶ 49.  On November 14, 2018, Mr. Palmer used DCP's computer system to access his personal email account (djpalmer37@gmail.com) and opened an email that had been forwarded to him with the subject line "S&P Capital IQ Agreement for Ascend Capital Group." *Id*. at ¶ 50;  Notably, DCP provided

and Mr. Palmer used the very same S&P Capital IQ platform in his work as an Associate for DCP. Thus, on November 14, 2018 Palmer had already begun preparing to jump ship to Ascend.

On November 15, 2018, Mr. Palmer used DCP's computer system to access his personal email account and opened an email with the subject line "Welcome to ascendcg.com." This email was a notification that Mr. Palmer's Ascend email account was active and Mr. Palmer now had the ability to access that email account. Later that day, Mr. Palmer used DCP's computer system to visit Ascend's website. *Id*. at ¶ 51. On November 16, 2018, Mr. Palmer used DCP's computer system to access his personal email account and opened an email with the subject line "You have been added to a Team Drive: Logo Design." *Id*. at ¶ 52. On November 19, 2018, Mr. Palmer used DCP's computer system to access "My Drive – Google Drive" and "Team Drive" and proceeded to visit shared folders entitled "Logo Design" and "Favorite Logos." *Id*. at ¶ 53. These actions confirm that Mr. Palmer was invited to join Ascend's Google Drive, that he accepted the invitation, and helped select its logo while employed by DCP.

On Ascend's website, it describes itself as providing "sophisticated M&A advisory services to high-growth companies & institutional investors," confirming that it operates within the same market as DCP. *Id*. at Exhibit E. Indeed, there are a number of similarities between DCP and Ascends websites which suggest that Palmer specifically intended to compete in the same market as DCP.  For example, (1) DCP's website includes a logo of a needle and thread to indicate that it provides "Bespoke Structures and process tailored to your needs" and Ascends has a similar logo indicating that it provides "Tailored Solutions No two companies or processes are the same.  Our team provides services and guidance to meet the needs and expectations of our clients."  *Id*. at ¶ 56. (2) DCP's website notes that "Our team is an extension of yours" and Ascend's states that "ACG serves as an extension of the company's team"; (3) DCP states that it "delivers superior

M&A execution capabilities versus traditional investment banking offerings or scaling an internal team" while Ascend highlights that its "robust M&A expertise across corporate development, private equity, and investment banking provides our clients with a level of experience unlike traditional advisory firms." *Id*. The similarities between DCP's established website and the newly created Ascend website further demonstrates that Ascend was created to compete in the same market as DCP.  Indeed, when Palmer was confronted about the similarities between the websites he responded that he had "changed some of the wording and used a different font." *Id*. at ¶ 57.

On December 20, 2018, Mr. Palmer was terminated from DCP and immediately joined Ascend.

### F.  Mr. Palmer's Departure from DCP and Theft of its Proprietary Information.

On December 20, 2018, Mr. Palmer was terminated by DCP for poor performance. That same day, Mr. Palmer stated to several DCP colleagues that he was starting a financial advisory business to compete directly against DCP.  *Id*. at ¶ 41.  Indeed, a search of Mr. Palmer's computer activity on the days leading up to his termination revealed that, not only had he been advising and assisting in the creation of Ascend, but also that he had planned to and did copy and exfiltrate DCP's Proprietary Information. *Id*. at ¶ 42.

Mr. Palmer conducted searches for and ultimately purchased an external hard drive between December 11 and December 15, 2018, to unlawfully copy DCP's Confidential and Proprietary Information for Ascend's benefit. *Id* at ¶ 43. On December 15, 2018, Mr. Palmer connected to DCP's computer system and accessed and copied DCP's highly confidential information contained in the network computer "D:\_DCP" "and "D:\_DCP_" file folders, which contain DCP's client files, including specifically DCP's proprietary target lists to an external hard drive. *Id*. at ¶ 44. Mr. Palmer then exfiltrated that hard drive and the data he had copied onto it for his later use at Ascend. *Id*. at ¶ 45.

In doing so, Mr. Palmer intentionally accessed DCP's computer systems without authorization to copy DCP's trade secrets and other data from its shared drives. *Id*. at ¶ 46. Indeed, Mr. Palmer's access to that data was premised on his explicit agreement that the data contained on those systems was DCP's exclusive property and that he was not permitted to retained any of that data if he was no longer employed by DCP.  Moreover, Mr. Palmer was aware that that data was subject to non-disclosure agreements between DCP and third-parties which further restricted the access to and use of that data. Indeed, Mr. Palmer had experience dealing with those NDA's during his employment at DCP.  Additionally, Mr. Palmer was and has been in actual possession of those NDA's—and, therefore, was presumably aware of them—because they were included in the data that he copied and exfiltrated. *Id*. at ¶ 47.  On top of the NDA's, a substantial amount of that data was explicitly labeled as "Confidential."  *Id*. Mr. Palmer also knew that the data he was copying contained DCP's Proprietary information, trade secrets and Client Information as he used portions of that very same data in his work for DCP.

**G.  Defendants Use DCP's Trade Secrets and Target DCP's Customers.**

After misappropriating DCP's Proprietary Information and Client Information, Palmer began to use that data to Ascend's benefit and in direct competition with DCP. For example, Mr. Palmer and Ascend solicited and secured Company A as a client. *Id*. at ¶ 59.  Company A was a fully vetted and highly prioritized target of Company D, one of DCP's clients.  *Id*. at ¶ 60. Indeed, Company D had engaged with Company A prior to Mr. Palmer's termination by DCP. Company A was known to Mr. Palmer only because of his confidential work for DCP and as a member of DCP's Company D coverage team. *Id*.  By virtue of that position, Mr. Palmer had access to an M&A tracker document which DCP created for Company D.  That tracker was confidential Client Information held by DCP and owned by Company D. *Id*. at ¶ 63.  Apart from

DCP, Company D and their respective employees no one had authority to access that document. *Id*. at ¶ 64. But for Mr. Palmer's unauthorized and subsequent copying of that tracker, neither he nor Ascend would have been able to identify Company A as a potential target and secure it as a client. *Id*. at ¶ 65.

Other DCP clients, contacts and targets being contacted by Mr. Palmer on behalf of Ascend now include, but are not limited to, Company R and Company S. Mr. Palmer would not have been able to identify and target those companies behalf of Ascend but for his access and subsequent use of DCP's Proprietary Information.

Mr. Palmer and Ascend continue to misuse DCP's Proprietary Information. Indeed, as recently as September 12, 2019, Mr. Palmer contacted Company D, on behalf of a prospective target of Company D, in an effort to attempt to resurrect a deal involving that client that Company D had previously contemplated, but ultimately did not pursue. *Id*. at ¶ 69. Neither Mr. Palmer nor Ascend would have known that Company D had previously contemplated that transaction—and, therefore would not have known that he transaction could potentially be resurrected—without misusing DCP's Proprietary Information. *Id*. at ¶ 70.

Moreover, having access to DCP's Proprietary Information and its Client Information gave Palmer and Ascend access to DCP's financial and other non-public information, historical account discussions, estimated valuations, due diligence, models, timelines and planning material. *Id*. at ¶ 71. Thus, they were able to exploit the benefits of DCP's labor, in that they did not have to go through the time and expense of creating these documents themselves and were also able to use these documents and information in direct competition against DCP and to the potential determinant of DCP's clients. *Id*. at ¶ 72.

## III.     LEGAL STANDARD

In deciding whether a preliminary injunction should issue under Federal Rule of Civil

Procedure 65(a) and 15 U.S.C. § 1116(a), this Court considers the following four factors: (1) the

likelihood that DCP will prevail on the merits at a final hearing; (2) the extent to which DCP is

being irreparably harmed by the conduct complained of; (3) the extent to which the Defendants

will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

*Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 13 (D.D.C. 2009).  However,

DCP need not prevail on every one of these factors, rather they must be balanced based on their

relative weight.  *Id.* at 13-14; *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 235

(D.D.C. 2014) *(quoting Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir.

2009) ("In this Circuit, the four factors have typically been evaluated on a 'sliding scale,' such

that if 'the movant makes an unusually strong showing on one of the factors, then it does not

necessarily have to make as strong a showing on another factor'").

While there is some question regarding the extent to which this "sliding scale" approach

still applies—given the Supreme Court's decision in *Winter v. NRDC*, 555 U.S. 7 (2008)—DCP

has proven each of the four requirements entitling it to an injunction for each of its claims.  *See*

*Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 426 (D.D.C. 2018) (*Comparing Davis*

*v. Billington*, 76 F.Supp.3d 59, 63 n. 5 (D.D.C. 2014) ("[B]ecause it remains the law of this

Circuit, the Court must employ the sliding-scale analysis here."), with *ABA, Inc. v. District of*

*Columbia*, 40 F.Supp.3d 153, 165 (D.D.C. 2014) ("The D.C. Circuit has interpreted Winter to

14

require a positive showing on all four preliminary injunction factors." (citing *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d at 1296.

## IV.   LEGAL ARGUMENT

### A.   DCP is Entitled to Injunctive Relief for its Claims for Misappropriation of its Trade Secrets and Breach of the Restrictive Covenants to DCP.

#### a.   DCP is Likely to Succeed on its Claim for Misappropriation of Trade Secrets.

In order to succeed on its misappropriation of trade secrets claim, DCP must prove: "(1) the existence of a trade secret; and (2) acquisition of the trade secret by improper means, or improper use or disclosure by one under a duty not to disclose." *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 77 (D.D.C. 2007).  A "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process," that "[d]erives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and [i]s the subject of reasonable efforts to maintain its secrecy." D.C. Code § 36-401 .  "Customer lists of a financial-services firm deserve trade-secret status."  *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 76 (D.D.C. 2001).

#### 1.   DCP's Trade Secrets

DCP's Trade Secrets consist of Proprietary Information in the form of processes, standards, data, method, techniques, client information, contract information, cost information, customer information, employee information and supplier information regarding M&A transactions as well as the identify of customers, suits and targets; and Client Information in the

15

form of financial, suppliers and vendors to the client, and sensitive business information in the client's industry. *See* Section II.A., *infra*.

DCP specially developed and created the Proprietary Information over the years which is crucial to DCP's success and took well documented steps to protect this information by requiring employees to enter into employment and severance agreements that acknowledge and define the confidential trade secrets, and the ongoing obligation to maintain and keep this information confidential.  Likewise, the application of DCP's proprietary methods and business systems to Client Information requires specialized training and access to DCP's confidential Proprietary Information.  Moreover, and as set forth above, maintaining the confidentiality of both the Proprietary Information and the Client Information is vital to DCP's business.

### 2.    Palmer Improperly Copied and Removed DCP's Trade Secrets

On December 15, 2019 while still employed by DCP, Palmer connected a Western Digital My Passport USB Device to DCP's computer system and copied DCP's highly confidential information, including but not limited to DCP's Proprietary Information and Client Information, without authorization or approval from senior management at DCP. Lynch Decl. at ¶ ¶ 44, 45.  These deliberate actions were taken in direct violation of existing obligations under Palmer's employment agreements. Moreover, Palmer signed the PIAA and Severance agreements knowing that he had already misappropriated DCP's trade secrets and intended to use them against DCP at his new position with Ascend.  *See,* Section II.D., *supra*.

### b.  DCP is Likely to Succeed on its Claim for Breach of the Restrictive Covenants.

When he stole DCP's trade secrets and used them to start up Ascend, Palmer breached his obligation not to take, use or share its trade secrets and not compete with DCP. This Court

routinely issues preliminary injunctions to protect employers in similar situations. *See, e.g., Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 198 (D.D.C. 2010) (granting injunction to enforce such provisions in an employment agreement because it furthers the public interest of promoting free and fair competition); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 34 (D.D.C. 2002) (granting injunction to enforce contract provision to protect confidential information and trade secrets because it serves the public interest). The Court should do the same here. When Palmer set up Ascend, took DCP's confidential information and knowingly misappropriated and used the information to compete directly with DCP in the very same industry and city, he breached his promise and continues to breach his promises to DCP causing irreparable harm. An injunction is the only way to protect DCP's, DCP's Clients' and the public's interests.

### 1. DCP has demonstrated a likelihood of success for breach of the covenants of confidentiality.

The Employment Agreement is governed by Virginia law. *See* Lynch Decl. at Ex. A§ 6.4. To prove a breach of contract under Virginia law, DCP must show: (1) the existence of a legally enforceable obligation, (2) that Palmer breached the obligation, and (3) that the breach injured DCP. *Ulloa v. QSP, Inc.*, 271 Va. 72, 79, 624 S.E.2d 43, 47 (2006).

Under Virginia law an offer of employment is sufficient consideration to support a noncompete or non-solicitation agreement. *See, e.g., Blue Ridge Anesthesia v. Gidick*, 389 S.E.2d 467, 468 (1990). Thus, the Employment Agreement is sufficient impose the obligations set forth therein upon Palmer.

While the general rule is that an employee *may* compete with his former employer, he *may not* exploit the employer's confidential information or trade secrets. *Nat'l Legal Research Grp. v. Lathan*, No. CIV. A. 92-0031-C, 1993 WL 169789, at *7 (W.D.Va. May 17, 1993), *aff'd,*

*sub nom. Nat'l Legal Research Grp., Inc. v. Lathan*, 42 F.3d 1386 (4th Cir. 1994). This is especially true when, as here, the employee explicitly agreed not to disclose or misappropriate those trade secrets. Virginia courts routinely enforce reasonable confidentiality agreements as long as the agreement is (1) no broader than necessary to protect the owner's legitimate business interests; (2) not unduly oppressive to the one seeking to use the information and (3) not in violation of public policy. *Eden Hannon & Co. v. Sumitomo Trust & Banking Co.,* 914 F.2d 556, 560–61 (4th. Cir. 1990) (enforcing agreement preventing use of confidential bidding information).  Virginia courts recognize that companies have a legitimate interest in protecting their customer contacts because companies invest "a great deal of time and personal contact to build a solid base of clients." *Id*. at 562-63.

In his Employment Agreement, Palmer "acknowledge[d]" that he would have access to information "confidential to DCP" including "trade secrets," "marketing plans," "client lists, "and information relating to employees, suppliers, customers, and persons in a contractual relationship with DCP."  Lynch Decl. at Ex. A at § 5.1. He also acknowledged that "disclosure of [this information] will be highly detrimental to the best interests of DCP." *Id.* In addition to these acknowledgments, he covenanted that he would "not disclose, for the duration of [his] employment or any time thereafter, any such information" or "use or exploit . . . such information for any purpose other than for the purposes of DCP."  *Id.*  Moreover, Palmer also covenanted that he would return "all books, records and accounts relating in any manner to DCP."  *See id.* at § 6.11.

As set forth above, DCP, has spent substantial time and resources to cultivate its client relationships and proprietary and confidential business systems and methods, and thus has a legitimate business interest in protecting that information. And DCP protected that considerable

18

investment with a confidentiality provision that is not unduly burdensome, applying only to DCP's confidential information or trade secrets. Enforcing this provision reinforces the sound public policy of "protect[ing] the development of trade secrets without ruining competition or driving the receiver of confidential information out of business." *Eden Hannon & Co.* at 563. Thus, DCP has established the existence of a legally enforceable obligations.

Palmer breached this enforceable confidentiality provision when he copied DCP's confidential information, including the Proprietary Information and Client Information, exfiltrated that data to his new employer and used it to the benefit of Ascend, DCP's direct competitor. This conduct violated Palmer's covenants to return DCP's records, maintain the confidentiality of those records and not to exploit DCP's confidential information.

### c. These Breaches Have Caused Irreparable Harm to DCP.

Palmer's participation in the formation and operation of Ascend and improper use and disclosure of DCP's Trade Secrets are causing DCP to "lose [its] competitive advantage, . . . and that loss would be hard to quantify through money damages." *Hosp. Staffing*, 736 F. Supp. 2d at 200; Complaint ¶¶ 69, 81, 94-95, 106-108; *see also Morgan Stanley*, 150 F. Supp. 2d at 77 (finding damages to be incalculable because former employee serviced hundreds of client accounts with no reliable way of determining which clients would be affected). Such incalculable harm necessitates a finding of irreparable harm and entry of a preliminary injunction. *See Morgan Stanley*, 150 F. Supp. 2d at 77 (finding damages incalculable because there was no reliable way to determine the extent of clients affected); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schulz*, 2001 WL 1681973, at *4 ("[T]he Court ultimately agrees with Merrill Lynch that the difficulty in calculating damages can be great. And as evidenced by the number of cases involving brokers who leave their employer to work for a competitor,

solicitation is a recurring problem that, without adequate equitable relief, can ultimately cause attrition in companies as Merrill Lynch.").

An employer is also irreparably harmed through "the loss of its customers and by the possibly permanently damaged relationships with its customers." *Morgan Stanley DW Inc. v. Rothe,* 150 F. Supp. 2d 67, 77 (D.D.C. 2001). Likewise, where a company's business requires it to maintain the confidentiality of its clients' information, that company "will suffer irreparable harm to its business reputation if people come to believe that it cannot be trusted to maintain the confidentiality of" that client information. *Human Touch DC, Inc. v. Merriweather*, No. 15-CV-00741 (APM), 2015 WL 12564162, at *2 (D.D.C. May 18, 2015). Courts in this district have also held that a company would suffer irreparable harm if a defendant, who gained access to confidential information conditionally based on his agreeing to a confidentiality agreement, would suffer irreparable harm if that defendant was not enjoined from using and disclosing the confidential information received pursuant to that agreement. *Nat'l Elevator Cab & Door Corp.*, 282 Fed.Appx. at 887; *Hosp. Staffing Sols., LLC,* 736 F. Supp. 2d at 200. Palmer's breach has caused irreparable harm to DCP in all of these ways.

After misappropriating DCP's Proprietary Information Palmer and Ascend began to use that data to Ascend's benefit at the expense of DCP's relationship with its own customers. As set forth above, Palmer and Ascend solicited and secured Company A as a client by misusing information Palmer stole from DCP that was created for and owned by one of DCP's clients Company D, and subject to a nondisclosure agreement. Other DCP clients, contacts and targets being contacted by Mr. Palmer on behalf of Ascend now include (but perhaps are not limited to) Company R and Company S. Mr. Palmer would not have been able to identify and target those

company's on behalf of Ascend but for his access and subsequent use of DCP's Proprietary
Information.

  Furthermore, Palmer's recent contact to a DCP client, that was reported on September 12,
2019, to resurrect a proposed deal that was abandoned by the client is direct evidence of the
irreparable harm to DCP by Palmer and Ascend's unauthorized use of DCP's Trade Secret
information in violation of Palmer's employment and severance agreements.  If this Court does
not act to enjoin Palmer from further using DCP's Trade Secrets, then the irreparable harm to
DCP will continue.  *See Council on Am.–Islamic Relations v. Gaubatz*, 667 F.Supp.2d 67, 76
(D.D.C. 2009) (finding that further disclosure of improperly obtained emails and other electronic
documents would cause irreparable harm).

  Finally, the underlying violation of the covenant of confidentiality alone will cause
irreparable damage to DCP's position in the marketplace.  As set forth in the declaration of
Matthew Lynch, DCP's Managing Director, maintaining the confidentiality of client data is
essential to a financial advisory firm's success.  This is especially so when dealing in M&A
where the disclosure of confidential information relating to pending, contemplated or completed
transactions could cause a deal to fall apart or cause the client to incur substantial additional
costs to consummate that deal.  Thus, Palmer's breach of his covenants of confidentiality and the
subsequent use and disclosure of that information by Palmer and Ascend have caused irreparable
harm to DCP.  The Court should, therefore, issue an injunction to prevent any further harm to
DCP.

  **d.  The Balancing of the Resulting Harm Favors DCP.**

  The balancing of the respective harms that would be caused to DCP by Mr. Palmer's
continued misuse of DCP's Trade Secrets and the burden of holding Mr. Palmer to the already

agreed to covenant in his employment agreements weight heavily in favor of issuing a

preliminary injunction.  Indeed, Courts in this district have regularly found that issuing an

injunction to enforce a covenant of confidentiality does not impose an undue burden or risk

outweighing the harm posed by continued disclosure and use of confidential

information. *See Merrill Lynch, Pierce, Fenner & Smith Inc.*, 298 F.Supp.2d, at 34 (holding that

when defendants agreed under an employment agreement not to engage in certain conduct, a

temporary restraining order preventing defendants from engaging in that same conduct does not

cause the defendants substantial injury).  Moreover, Ascend's hiring of Palmer has allowed it to

"to essentially skip much of the expensive, time-intensive" training Palmer or developing its own

systems and methods to compete in the market, at DCP's expense. *See, Robert Half Int'l Inc. v.*

*Billingham*, 315 F. Supp. 3d 419, 434 (D.D.C. 2018) (quoting *Reg Seneca, LLC v. Harden*, 938

F.Supp.2d 852, 860 (S.D. Iowa 2013)).

  Injunctive relief would merely hold Palmer to the obligations to which he already agreed

and unwind the unfair advantage Ascend has derived through its access and use of DCP's data.

On the other hand, in the absence of such relief, DCP would continue to suffer increasing and

irreparable harm from the disclosure and use of its confidential Proprietary Information and

Client Information.  Palmer also explicitly agreed that "in the event of a breach of the [restrictive

covenants] DCP's remedy in the form of monetary damages will be inadequate and that DCP

shall be, and is hereby authorized and entitled, in addition to all other rights remedies available to

it, to apply for and obtain from a court of competent jurisdiction interim and permanent

injunctive relief." *See* Lynch Decl. at Exhibit A, §5.7.  Palmer has already conceded that an

injunctive remedy is proper if he were to breach the covenants in the Employment Agreement.

Thus, Defendants will not be unfairly harmed by the issuance of a preliminary injunction, while DCP will be saved from continued, irreparable harm.

### e. The Public Interest Favors Issuing an Injunction.

The public interest favors enforcing contractual agreements, especially those agreements intended to ensure the continued confidentiality of trade secrets and business information. *See Hosp. Staffing*, 736 F. Supp. 2d at 201; *Morgan Stanley*, 150 F. Supp. 2d at 79. "[B]y issuing an injunction, the court serves the public interest in protecting trade-secret client lists and other confidential information, an interest reflected by the adoption of the D.C. Uniform Trade Secrets Act." *Morgan Stanley*, 150 F. Supp. 2d at 79.

Palmer further agreed that he had no lawful right to retain possession of the data which he removed from DCP and subsequently disclosed to Ascend, having agreed to return all copies of that information to DCP upon his departure and further agreeing that that data was the exclusive property of DCP. An injunction preventing Palmer and Ascend from continuing to use the data which misappropriated in violation of several obligations and covenants is not an unfair nor unreasonable burden. Requiring DCP to continue to endure continuing irreparable harm would continue to damage its relationships with current customers, prevent them from winning new customers, and ultimately pose an existential threat to DCP.

Therefore, it is in the public's interest to enjoin bad actors from misappropriating and using confidential trade secrets and enforcing provisions in contractual agreements designed to prevent this behavior and containing reasonable and enforceable non-compete covenants. *See Hosp. Staffing*, 736 F. Supp. 2d at 201. It is also in the public's interest to ensure the continued confidentiality of a private entity's business information and trade secrets. *Id.*; *see also Morgan*

*Stanley*, 150 F.Supp. 2d at 79 (granting injunctive relief and finding that "the court serves the public interest in protecting trade-secret client lists and other confidential information").

## V.    CONCLUSION

Because DCP has established a likelihood of success on the merits of its misappropriation of trade secrets claim and breach of contract claim, and because it satisfies the four-factor injunction test used by this Court, DCP respectfully requests this Court to enter an order enjoining Defendants' Palmer and Ascend from using DCP's Proprietary Information and Client Information, and from contacting or soliciting DCP's clients during the pendency of this lawsuit.

Respectfully submitted,

Date:  October 25, 2019                    **DISTRICT CAPITAL PARTNERS, LLC**

                                           /s/ Kevin T. Carroll
                                           Kevin T. Carroll (DC 1020479)
                                           Wiggin and Dana LLP
                                           800 17th Street, Northwest, Suite 520
                                           Washington, DC 20006
                                           kcarroll@wiggin.com
                                           Phone: 202-800-2475
                                           Facsimile: 212-551-2888

                                           David L. Hall (DC 1033996)
                                           Wiggin and Dana LLP
                                           Two Liberty Place
                                           50 South 16th Street, Suite 2925
                                           Philadelphia, Pennsylvania 19102
                                           dhall@wiggin.com
                                           Phone: 215-988-8325
                                           Facsimile: 215-988-8344

                                           Kenneth K. Cho (DC 438783)
                                           Wiggin and Dana LLP
                                           437 Madison Avenue, 35th Floor
                                           New York, New York 10022

kcho@wiggin.com
Phone: 212-551-2613
Facsimile: 212-551-2888

28504\1\4839-8841-1307.v1

25