**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DISTRICT CAPITAL PARTNERS, LLC ,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No.  1:19-cv-3183-JEB** |
| | ) |
| **DOUGLAS A. PALMER, JR.,** *et al.* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MEMORANDUM IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

R. Mark Dare, D.C. Bar No. 975759
Micah E. Ticatch, D.C. Bar No. 1005398
ISLER DARE, P.C.
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
(703) 748-2690
(703) 748-2695 (fax)
mdare@islerdare.com
mticatch@islerdare.com

*Counsel for Douglas A. Palmer and Ascend Capital
Group, LLC.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..........................................................................................................II

INTRODUCTION ....................................................................................................................... 1

BACKGROUND .......................................................................................................................... 1

LEGAL STANDARD................................................................................................................... 6

ARGUMENT ............................................................................................................................... 7

    A.  DCP Will Not Suffer Irreparable Harm In The Absence Of An Injunction. ...................... 7

        1.  DCP's delay in bringing this action and declination of Defendants' offer to cooperate is strong evidence of a lack of irreparable harm. ........................................ 8

        2.  There is no actual or imminent threat of Ascend stealing DCP's customers............... 9

        3.  DCP cannot establish irreparable harm based on the mere fact that Mr. Palmer still has the DCP Files in his possession.................................................................... 10

        4.  Ascend's representation of Company A is not harmful to DCP............................... 11

        5.  Ascend's communication with Company D was not harmful to DCP. ...................... 12

        6.  Ascend's communications with Company S and Company R were not harmful to DCP.................................................................................................................... 13

        7.  There is no likelihood of further use or disclosure of the DCP Files. ....................... 13

    B.  DCP Has Failed To Show A Likelihood of Success On The Merits. .............................. 14

    C.  The Balance Of Harm Favors The Defendants................................................................ 16

    D.  The Public Interest Weighs Against A Preliminary Injunction. ....................................... 17

CONCLUSION........................................................................................................................... 18

## TABLE OF AUTHORITIES

Cases

*Am. Airlines, Inc. v. Imhof*,
   620 F. Supp. 2d 574 (S.D.N.Y. 2009) .................................................................................. 11

*Benisek v. Lamone*,
   138 S. Ct. 1942 (2018) ........................................................................................................ 17

*Council on Am.-Islamic Relations v. Gaubatz*,
   667 F. Supp. 2d 67 (D.D.C. 2009) ...................................................................................... 14

*Davis v. Pension Ben. Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ............................................................................................ 7

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
   356 F.3d 1256 (10th Cir. 2004) .......................................................................................... 17

*Econ. Research Servs., Inc. v. Resolution Econ., LLC*,
   140 F. Supp. 3d 47 (D.D.C. 2015) ................................................................................. 7, 10

*GEO Specialty Chemicals, Inc. v. Husisian*,
   923 F. Supp. 2d 143 (D.D.C. 2013) ...................................................................................... 8

*Graham Capital Mgmt., L.P. v. Bongiovanni*,
   2019 WL 632287 (D. Conn. 2019) ...................................................................................... 11

*Hosp. Staffing Sols., LLC v. Reyes*,
   736 F. Supp. 2d 192 (D.D.C. 2010) ................................................................................. 9, 10

*Human Touch DC, Inc. v. Merriweather*,
   2015 WL 12564162 (D.D.C. 2015) ..................................................................................... 14

*Jericho Baptist Church Ministries, Inc. v. Jericho Baptist Ministries, Inc.*,
   2016 WL 4487730 (D.D.C. 2016) ......................................................................................... 8

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schultz*,
   2001 WL 1681973 (D.D.C. 2001) .................................................................................... 9, 10

*Morgan Stanley DW Inc. v. Rothe*,
   150 F. Supp. 2d 67 (D.D.C. 2001) ................................................................................... 9, 10

*Moseley v. Bd. of Educ. of Albuquerque Pub. Sch.*,
   483 F.3d 689 (10th Cir. 2007) ............................................................................................ 11

*Munaf v. Geren*,
   553 U.S. 674 (2008) ............................................................................................................. 6

*Mylan Pharm., Inc. v. Shalala*,
   81 F. Supp. 2d 30 (D.D.C. 2000) ............................................................................. 8

*Newdow v. Bush*,
   355 F.Supp. 2d 265 (D.D.C. 2005) ......................................................................... 8

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
   48 F. Supp. 3d 87 (D.D.C. 2014) ........................................................................ 8, 9

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ................................................................................. 7

*Smith, Bucklin & Assos., Inc. v. Sonntag*,
   83 F.3d 476 (D.C. Cir. 1996) ................................................................................. 17

*Strobos v. RxBio, Inc.*,
   221 F. Supp. 3d 21 (D.D.C. 2016) ............................................................... 7, 14, 17

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................................................... 7

*Wisconsin Gas Co. v. F.E.R.C.*,
   758 F.2d 669 (D.C. Cir. 1985) ............................................................................... 11

## INTRODUCTION

The Court should deny the Motion for Preliminary Injunction (ECF No. 2) (the "Motion") brought by Plaintiff District Capital Partners, LLC ("DCP") against its former employee Douglas Palmer, and his new employer Ascend Capital Group, LLC ("Ascend").

As described in detail below, DCP's Motion is primarily premised on the fact that Mr. Palmer copied certain DCP data in December 2018 — a fact of which DCP has been aware since at least March 2019. In the meantime, in April 2019 and again in June of 2019, Mr. Palmer offered to destroy or return that data to DCP — but, for unknown reasons, DCP failed to respond to that offer. Defendants are not threatening to use DCP's data; are not threating to disclose the data; and are not stealing or competing for DCP's customers. In short, there is simply no irreparable harm to DCP that the requested injunction would prevent. For those reasons, among others, an injunction is improper, and the Motion should be denied.

## BACKGROUND

### *Mr. Palmer's Employment With, And Termination From, DCP.*

Mr. Palmer worked as an Associate for DCP from February 10, 2017 to December 20, 2017. *See* Declaration of Douglas A. Palmer, Jr. ("Palmer Decl."), ¶9. DCP is in the business of providing merger and acquisition ("M&A") advisory services to software and technology firms who are on the "Buy-Side", meaning they are in the market to acquire one or more other firms. *See id.* ¶¶5, 10. Plaintiff DCP does not provide M&A services to "Sell-Side" clients, which are firms looking to sell their company. *See id.*

In mid-December 2018, DCP's Managing Director, Matt Lynch, gave Mr. Palmer an extremely positive performance review, and awarded him a $120,000 bonus, which was provided to him on December 16, 2018. *Id.* ¶16. A few days later, on December 19, 2018, Mr. Palmer emailed Mr. Lynch to tell him he was not feeling well and would be taking the day off. *Id.* ¶17.

When Mr. Palmer returned to the office the next day, on December 20, 2018, Mr. Lynch terminated his employment, immediately. *Id.* ¶18.

Mr. Palmer's meeting with Mr. Lynch was relatively quick. *Id.* ¶20. At the end of the meeting, Mr. Lynch asked Mr. Palmer, "as a favor," to sign two forms, which Mr. Lynch refers to in his Declaration as the "Severance Agreement" and "PIIA" agreement. *See Id.* ¶20 (citing ECF No. 2-2, ¶37). Neither the Severance Agreement nor the PIIA provided any compensation or other consideration to Mr. Palmer. *See id.* ¶¶21-22.

**Ascend Does Not Directly Compete With DCP.**

On January 3, 2019, Mr. Palmer began employment with Ascend as Vice-President. *Id.* ¶24. DCP's Motion insinuates that Ascend, and Mr. Palmer, are directly competing with DCP and attempting to steal DCP's clients away. This is not accurate.

While it is true that Ascend and Mr. Palmer offer M&A advisory services like DCP does, the two companies are not direct competitors for the same clients. *See id.* ¶¶26-29. As noted, DCP is focused on serving Buy-Side technology and software companies. Ascend, on the other hand, does not represent those types of clients. All of Ascend's technology firms are Sell-Side, and all of Ascend's Buy-Side clients are outside the technology market. *Id.* ¶28. As a consequence, neither Ascend nor Mr. Palmer has entered into any client relationship with any of DCP's clients. *See id.* ¶26.

**Ascend's Representation of Company A.**

One of Mr. Palmer's job responsibilities for Ascend is to find new firms who might be interested in Ascend's M&A advisory services. *See id.* ¶39. At the end of January 2019, he

contacted the CEO of Company A[1] for this purpose.  *See id.* ¶41.  Mr. Palmer used standard internet tools to locate the CEO's contact information.  *See id.*

Company A is not, and has never been, a client of DCP.  *Id.* ¶42.  Nonetheless, DCP suggests Mr. Palmer's contact was improper because during his employment with DCP, Mr. Palmer assisted a client, Company D, in identifying potential acquisitions for Company D.  As part of that process, DCP compiled an M&A Tracker with approximately 500 potential companies that could fulfill Company D's needs.  *See id.* ¶¶33-34.  One of the 500 companies on that list was the Company A.  *Id.* ¶35.  However, Mr. Palmer never used any of DCP's confidential information or Company D's client information  to contact Company A (or in its subsequent representation of Company A).  *See id.* ¶¶54-55.

In their initial conversation, in March 2019, Company A's CEO indicated to Mr. Palmer that Company A had just received a Letter of Intent from Company D.  *Id.* ¶43.  Mr. Palmer had not previously been aware of this fact, or that Company D had such a high level of interest in acquiring Company A.  *Id.*  In April 2019, Mr. Palmer met in person with Company A's CEO.  *See id.* ¶44.  At that meeting, the CEO told Mr. Palmer that it could manage the acquisition itself and did not need Ascend's services.  *See id.* ¶¶44-45.

In July 2019, Company A informed Mr. Palmer that the deal with Company D had fallen through because after the completion of due diligence, Company D had sought to substantially lower the purchase price it was willing to pay, and Company A was not interested in accepting the lower purchase price.  *See id.* ¶46.  However, because Company A believed it was still in its

---

[1] As used in this Memorandum and the Palmer Declaration, the terms "Company A," "Company D," "Company R," and "Company S" all reference the same organizations that DCP and Mr. Lynch reference when using the same pseudonyms.  *See* Palmer Decl. FN 2.  Each company is also defined in the unredacted version of the Palmer Declaration.

strategic interest to be acquired by another buyer, it asked Mr. Palmer and Ascend to help it attract new suitors.  *Id.* ¶47.

Since that time, Ascend and Mr. Palmer have been representing  Company A.  *Id.* ¶48.  At this point Company A has received interest from a number of companies who wish to explore a purchase of Company A.  *Id.*

***Mr. Palmer's Entirely Proper Communications with Company D on Behalf of Company A.***

When the deal between Company A and Company D fell through, Company D asked that Company A let it know if Company A received offers from other potential acquirers.  *See id.* ¶49. In essence, Company D wanted a chance to reconsider its valuation of Company A before Company A got acquired and taken off the market.  *Id.*

In September 2019, because of the interest Company A was receiving from other parties, Mr. Palmer reached out to Company D and discussed the possibility of Company D making a new offer to acquire Company A.  *Id.* ¶50.  Mr. Palmer's communications with Company D were simple and straightforward and consisted of merely following up with Company D as it had specifically asked Company A to do.  *Id.* ¶51.

The communications with Company D did not harm DCP in any way.  *See id.* ¶¶54-62. In fact, if DCP had not filed its lawsuit alleging the communications were somehow improper and Mr. Palmer's communications had eventually led to a deal between Company D and Company A, DCP would have made a substantial profit on the transaction.  *See id.* ¶61.

***Mr. Palmer's Entirely Proper Communications with Company R on Behalf of Company A.***

DCP falsely suggests that Mr. Palmer solicited Company R to become a client of Ascend. This is untrue.  On August 16, 2019, without any solicitation, Company A received interest from Company R for a potential acquisition of Company A. *Id.* ¶64.

Because Mr. Palmer was advising Company A at that time, he participated in calls with Company R to discuss a potential deal to acquire Company A. *Id.* ¶65. After several conversations, it was determined that Company A was not interested in the type of structured deal that Company R wanted to pursue to acquire Company A, and the two companies parted ways. *Id.* ¶66.

There was nothing improper about Mr. Palmer's conversations with Company R. It did not involve any improper information or documents, and Company R is not a client (and never has been a client) of DCP. *See id.* ¶¶67-69.

***Mr. Palmer's Entirely Proper Communications with Company S.***

Shortly after he began working at Ascend, Mr. Palmer communicated with the Head of Corporate Development at Company S to ask if he would provide a quote for the Ascend website that vouched for Mr. Palmer's skills as an M&A advisor. *See id.* ¶71. Company S was a former client of DCP that Mr. Palmer had worked with during his employment. *Id.* ¶70. Although the Head of Corporate Development agreed to provide such a quote, Ascend decided not to use it on its website. *Id.* ¶72.

The communication with Company S did not involve any confidential information and did not harm DCP in any way. *See id.* ¶¶73-75.

***The DCP Files.***

In Mid-December 2018, at the end of his employment with DCP, Mr. Palmer made a copy of a number DCP documents (the "DCP Files") to his external hard drive. *See id.* ¶79. At the time, Mr. Palmer mistakenly believed he was entitled to retain copies of documents he had worked during his employment. *Id.* Mr. Palmer regrets his decision to copy the files and has acknowledged it represents a significant error in judgment on his part. *Id.* ¶80.

In March 2019, DCP's attorney wrote to Mr. Palmer and Ascend indicating it was aware that Mr. Palmer had copied the DCP Files. *Id.* ¶81.  In April 2019, Mr. Palmer's attorney responded to that letter and informed DCP that Mr. Palmer was agreeable to returning the DCP Files to DCP or to deleting them, and asked DCP to provide direction as to how it wanted Mr. Palmer to proceed. *Id.* ¶82.  The letter stated that Mr. Palmer was:

> willing to destroy [the DCP Files], or delete it, or return it….Again, we are amenable to your ideas about how best to do this….We stand ready to work with your client collaboratively to resolve this….

*Id.* ¶83.

In June 2019, Mr. Palmer's counsel again repeated this offer to DCP in another letter and further proposed "to work with [DCP's counsel] to develop a means of having your client's representatives examine the files to determine what they consist of, and then decide how DCP wants them disposed of." *Id.* ¶84.

Despite these offers, DCP never instructed Mr. Palmer to delete or return the files. *Id.* ¶85. Because following receipt of the March 2019 letter from DCP's attorney Mr. Palmer had a duty to preserve evidence, he could not delete the DCP Files without authorization from DCP.  After the June 2019 letter, DCP did not communicate with Defendants or counsel until September 25, 2019—more than three months later. *Id.* ¶86.  The Complaint and instant Motion then followed, one month after that. *Id.* Service of the Complaint and Motion were made on November 4, 2019.

As part of his declaration, Mr. Palmer has agreed not to use, access, review, or disclose any DCP Files in the future, except as required to defend the instant lawsuit. *Id.* ¶89.

## **LEGAL STANDARD**

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008).  A plaintiff can only be granted such a

remedy upon a <u>clear showing</u> that it is entitled to it.  *See, e.g., Strobos v. RxBio, Inc.*, 221 F. Supp. 3d 21, 22 (D.D.C. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To do so, a plaintiff must establish "that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter,* 555 U.S. at 21.

Prior to the Supreme Court's decision in *Winter*, courts in this Circuit held that these factors could be balanced on a "sliding scale."  However, the D.C. Circuit has, on multiple occasions, suggested (without formally holding) that this approach is incompatible with *Winter*, and that each factor should be seen as "independent, free-standing requirements."  *See Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011); *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J. concurring).  However, even under a sliding-scale approach, a plaintiff must make a clear showing that irreparable harm is likely to occur, in order to prevail on its request for injunctive relief.  *See, e.g., Econ. Research Servs., Inc. v. Resolution Econ., LLC*, 140 F. Supp. 3d 47, 52 (D.D.C. 2015).

In light of the above precedent, District courts have expressed uncertainty regarding whether the sliding-scale approach can still be applied.  However, in most circumstances, like the instant case, that question does not change the ultimate conclusion.  Because, as demonstrated below, all four factors cut against DCP's Motion, the Motion should be denied.

## ARGUMENT

### A.    DCP Will Not Suffer Irreparable Harm In The Absence Of An Injunction.

In order to prevail on its Motion, DCP must clearly demonstrate that it is "<u>likely</u> to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20 (emphasis added). Where a plaintiff fails to meet this burden, an injunction is properly denied without the need to consider the other factors. *See, e.g., Strobos v. RxBio, Inc.,* 221 F. Supp. 3d 21, 22 (D.D.C. 2016).

The D.C. Circuit sets a "high standard" to establish irreparable harm. *GEO Specialty Chemicals, Inc. v. Husisian*, 923 F. Supp. 2d 143, 147 (D.D.C. 2013). "Indeed, proving irreparable injury is a considerable burden, requiring proof that the movant's injury is <u>certain, great and actual</u>—not theoretical—and <u>imminent</u>, creating a clear and present need for extraordinary equitable relief to prevent harm." *Id.* (emphasis in original, citations omitted).

DCP has not met this burden. As discussed more fully below, DCP has not, and cannot, demonstrate that absent the injunction it will suffer irreparable harm that is certain, great, actual, and imminent.

### 1. *DCP's delay in bringing this action and declination of Defendants' offer to cooperate is strong evidence of a lack of irreparable harm.*

"Courts have found that an unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting *Newdow v. Bush*, 355 F.Supp. 2d 265, 292 (D.D.C. 2005)). The logic behind this rule is sound. If a plaintiff is truly experiencing irreparable harm (or truly worried about imminent future irreparable harm), they will almost certainly want to run to a court as quickly as possible. When a plaintiff sits on his hands for a long period of time before coming to court, as DCP did here, it suggests that the threat of irreparable harm is nonexistent .

In applying this rule, this Court has generally found that multi-month delays between the initial perceived violation and the request for injunctive relief demonstrates a lack of irreparable harm. *See Open Top*, 48 F. Supp. 3d at 90-91 (95-day delay was sufficient reason to deny injunction); *Newdow*, 355 F. Supp. 2d at 292 (35-day delay showed lack of irreparable harm); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (two-month delay "militates against a finding of irreparable harm."); *Jericho Baptist Church Ministries, Inc. v. Jericho Baptist*

*Ministries, Inc.*, 2016 WL 4487730, at *3 (D.D.C. 2016) (seven-month delay bolstered finding of lack of irreparable harm).

In this case, Mr. Palmer's copying of the DCP Files occurred in early December 2018. Palmer Decl. ¶79.  DCP was aware of the copying at least by the time of its first letter to Mr. Palmer and Ascend, which was sent on March 7, 2019.  *Id.* ¶81.  In response to that letter, in both April 2019, and June 2019, Mr. Palmer offered to delete or return the DCP Files.  *See id.* ¶¶82-84. DCP did not respond to these unconditional offers.  *See id.* ¶¶85-86.  In fact, after the June 2019 offer, DCP did not communicate with Defendants for over three months, without explanation.  *Id.* Then, on October 25, 2019, <u>over ten months</u> after the copying, DCP filed suit.  DCP served the Complaint and Motion on November 4, 2019.

DCP's delay is substantially longer and more egregious than any of the delays cited in the above cases.  Further, DCP has not provided any excuse for the significant delay or its refusal to respond to the offers to address its concerns collaboratively, or explained how it can claim irreparable harm in light of such conduct.  DCP, therefore, has failed to meet the serious and substantial burden on its Motion, and its request for injunction should be denied for this reason alone.  *See Open Top*, 48 F. Supp. 3d at 90-91.

### 2.       *There is no actual or imminent threat of Ascend stealing DCP's customers.*

In its Motion, DCP attempts to establish irreparable harm by citing several cases holding that imminent and actual threats to steal customer relationships can, under certain circumstances, justify an injunction.  *See* ECF No. 2-1, p.19-20 (citing *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192 (D.D.C. 2010); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001); and *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schultz*, 2001 WL 1681973 (D.D.C. 2001)).

However, those cases are entirely inapposite.  Each one presented the following scenario: a former employee with a nonsolicitation covenant accepted employment at a <u>direct competitor</u> of

the former employer, and immediately began <u>soliciting the former employers' clients</u> for his new employer in an attempt to steal the former employer's clients.  *See, e.g., Hosp. Staffing*, 736 F. Supp. 2d at 195; *Morgan Stanley*, 150 F. Supp. 2d at 71; *Merrill Lynch*, 2001 WL 1681973 at *2.

Those cases bear little resemblance to the instant matter.  As noted, Ascend is not a direct competitor with DCP because they target different customers.  *See* Palmer Decl. ¶¶ 26-32.  Ascend simply does not represent the same type of clients as DCP.  *Id.*  Moreover, DCP has not alleged that Ascend is soliciting DCP's clients.  More to the point, there is no evidence suggesting Ascend or Mr. Palmer have any intention of stealing DCP's clients— because they have no such intention.  Quite simply, DCP is not in any danger of losing its customers to Ascend, and any insinuations to the contrary is without basis.

Furthermore, even if DCP *could* demonstrate a likelihood of customer loss, which it cannot, such losses only meet the criteria for irreparable harm if they threaten the company's very existence.  *E.g., Econ. Research Servs., Inc. v. Resolution Econ., LLC,* 140 F. Supp. 3d 47, 52-54 (D.D.C. 2015) (denying injunction where although clients had been lost, the plaintiff provided "no evidence that ERS will be forced to lay off personnel in other offices, or that defendants' actions will grossly deplete its capital.").  To state the obvious, there is absolutely no evidence that DCP's existence is threatened by any of Defendants' conduct.

   3.   ***DCP cannot establish irreparable harm based on the mere fact that Mr. Palmer still has the DCP Files in his possession.***

In its Motion, DCP also seems to argue that Mr. Palmer's mere possession of the DCP Files is sufficient to establish irreparable harm because DCP's reputation will allegedly be harmed if their clients learn that it cannot be trusted to maintain their confidences.  *See* ECF No. 2-1, p.21.  That argument, however, does not work in these circumstances.

First, an injunction is only appropriate for the purpose of preventing future harm— not for remedying past harm. *See, e.g., Wisconsin Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.C. Cir. 1985); *Moseley v. Bd. of Educ. of Albuquerque Pub. Sch.*, 483 F.3d 689, 693 (10th Cir. 2007). To the extent DCP is arguing that it experienced reputational harm in the immediate aftermath of Mr. Palmer copying the DCP Files in December 2018, any such alleged harm — which Defendants deny — has already occurred and not directly relevant to the irreparable harm analysis.

On the other hand, to extent DCP is arguing that each day Mr. Palmer retains the DCP Files DCP's reputation is somehow harmed further, this argument is implausible given the fact that DCP failed to authorize Mr. Palmer to delete the DCP Files in April 2019 and June 2019, when he offered to do so. Common sense suggests that if Mr. Palmer's retention of the files were actually causing daily irreparable harm to DCP, the company would have agreed quickly to the deletion within days of Mr. Palmer's offer. Instead, despite Mr. Palmer's offer, DCP never authorized the deletion, waited seven more months, then filed the instant suit. DCP's own conduct establishes that it was not being irreparably harmed by Mr. Palmer's retention of the files.

Moreover, the fact that Mr. Palmer offered to destroy or return the DCP Files demonstrates that he does not intend to use them to harm DCP in the future, and future irreparable harm is unlikely. *See, e.g., Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 2d 574, 580 (S.D.N.Y. 2009) (no irreparable harm where employee offered to destroy copied documents); *Graham Capital Mgmt., L.P. v. Bongiovanni*, 2019 WL 632287, at *5 (D. Conn. 2019) (no irreparable harm where employee offered to return recordings).

### 4. *Ascend's representation of Company A is not harmful to DCP.*

In its papers, DCP insinuates that Ascend's representation of Company A came about wrongfully and is somehow harmful to DCP. *See, e.g.,* Motion (ECF No. 2-1, p.20-21); Lynch Decl. (ECF No. 2-2, ¶¶ 61-64). Such claims have no merit.

First, DCP argues that "Palmer and Ascend solicited and secured Company A as a client by misusing information Palmer stole from DCP." *See* ECF No. 2-1, p.20. But this accusation is based on nothing other than Mr. Lynch's speculation — and it is false. *See* Palmer Decl., ¶¶41, 54. In fact, as stated by Mr. Palmer in his declaration, he retrieved Company A's contact information from standard internet tools, which he identifies—not from any DCP document -- and he has never used any confidential information in his representation of Company A. *See id.* ¶¶41, 54, 55.

Second, Ascend's representation of Company A has not harmed DCP in any way. Company A is not, and has never been, a client of DCP. *Id.* ¶¶42, 58. DCP is not even in the market to represent Sell-Side companies like Company A. *Id.* Further, DCP's representation of Company D likely precludes DCP from representing Company A, even if it wanted to. *Id.*

Consequently, there is absolutely no basis for suggesting that Ascend's representation of Company A is likely to cause irreparable harm to DCP in the future. DCP's suggestion otherwise is incorrect.

### 5.    *Ascend's communication with Company D was not harmful to DCP.*

In its papers, DCP implies that Ascend's recent communications with Company D were somehow harmful to DCP. *See* Motion (ECF No. 2-1, p.21). This is false.

Mr. Palmer communicated with Company D on behalf of Company A, for the sole purpose of alerting Company D to the fact that Company A was receiving acquisition interest from other potential suitors. *See* Palmer Decl. ¶¶49-51, 60. This is a communication that Company D specifically asked Company A to make so that it could reconsider its valuation decision before Company A was taken off the market. *Id.*

Not only was Mr. Palmer's communication not harmful to DCP, but it was actually entirely aligned with DCP's interests. If Mr. Palmer had been able to secure a new offer from Company D

that the Company A owners agreed to accept, DCP would have earned a very large commission. *Id.* ¶61.

Incredibly, DCP has sought to portray Mr. Palmer's helpful communication with Company D as somehow indicative of a desire to harm DCP. But that claim is nonsensical. Because Mr. Palmer's communication with Company D obviously did not harm DCP in any way, it does nothing to support DCP's claim for injunctive relief.

### 6. Ascend's communications with Company S and Company R were not harmful to DCP.

DCP also suggests that it was somehow harmed when Mr. Palmer communicated with Company R and Company S. This assertion also is without merit.

As noted, Mr. Palmer did not solicit Company R. *See* Palmer Decl. ¶¶63-69. Rather, Company R reached out to Company A because it was interested in acquiring Company A. *Id.* ¶64 Mr. Palmer only had communications with Company R to talk through Company R's offer, which ultimately was rejected by Company A. *See id.* ¶¶65-66. There is absolutely nothing improper about Mr. Palmer's communications with Company R and DCP was not harmed in any way by those communications. *See id.* ¶¶63-69.

Likewise, Mr. Palmer's communications with Company S consisted of his requesting a quote vouching for his skills as an M&A advisor. *See id.* ¶¶70-75. Again, there was nothing improper about this communication. There is no plausible claim that this communication harmed DCP in any and certainly there is no argument that it demonstrates a likelihood that DCP will experience irreparable harm in the future. *See id.*

### 7. There is no likelihood of further use or disclosure of the DCP Files.

In a typical preliminary injunction matter involving trade secrets or confidential information, like those cited by DCP, a plaintiff runs to court immediately after they have

discovered improper copying or disclosure of the secret information.  *See, e.g., Human Touch DC, Inc. v. Merriweather,* 2015 WL 12564162, at *1 (D.D.C. 2015) (application for injunction within 6 days of improper copying); *Council on Am.-Islamic Relations v. Gaubatz,* 667 F. Supp. 2d 67, 71 (D.D.C. 2009) (injunction filed within 14 days of initial public disclosure).

In such circumstances, where the defendant has just copied or disclosed the information, it may be reasonable for a court to presume the defendant is likely to further use or disclose that information in the near future.  But that is not this case here.

In the instant matter, nearly a year has passed since the copying of the information took place.  *See* Palmer Decl. ¶79.  In April 2019, Mr. Palmer offered to delete the DCP Files. *Id.* ¶¶82-83.  Mr. Palmer repeated that offer again in June 2019.  *Id.* ¶84.  He has now signed a declaration, under oath, stating that he will not use, access, review, or disclose those files, except as required to defend this action.  *Id.* ¶89.  Under these circumstances, it is simply not reasonable to conclude that Mr. Palmer or Ascend is likely to use or disclose DCP's information in the immediate future.

Because DCP has failed to demonstrate irreparable harm, the request for an injunction should be denied.  *E.g., Strobos,* 221 F. Supp. 3d at 22.

**B.**     **DCP Has Failed To Show A Likelihood of Success On The Merits.**

Even if DCP could demonstrate irreparable harm, which it cannot, its Motion should still be rejected because DCP has failed to identify a successful claim on the merits that could cause such an injury.

Although DCP's Complaint contains seven counts, the Motion is based only on two claims: that Defendants violated the Uniform Trade Secrets Act, and that Mr. Palmer breached the confidentiality clause in his Offer Letter.  *See* ECF No. 2-1, p.15-19.[2]

For both claims, DCP relies primarily on the fact that Mr. Palmer copied the DCP Files to his hard drive in December 2018.  However, considering that event took place nearly a year ago, any harm it caused has already accrued to DCP, and future irreparable harm based on that act is extremely unlikely.

Further, on the more pertinent question, DCP has failed to put forward factual evidence to show a likelihood of  success on any claim that Mr. Palmer and/or Ascend used or disclosed confidential, or trade secret, information recently.  The absence of such proof negates the demand for the extraordinary relief provided by an injunction.

DCP has inaccurately alleged that Mr. Palmer used DCP Files to contact Company A, relying solely upon false speculation by Mr. Lynch.  But, as Mr. Palmer stated in his declaration, this is not true.  Palmer Decl. ¶¶41, 54.  Company A's CEO's contact information was located using common internet tools.  *See id.*  Further, Mr. Palmer has not used any of DCP's confidential information in his representation of Company A.  *Id.* ¶55.

DCP has also incorrectly insinuated that Mr. Palmer's communications with Company D, Company S, and Company R somehow violated the trade secret statute or the confidentiality covenant.  But this baseless insinuation also is simply not true. In all three of these situations, the allegations in Mr. Lynch's Declaration that confidential information was utilized is nothing more

---

[2] Although DCP does not seem to rely on the covenants in the Severance Agreement and/or PIIA for purposes of the injunction, it does mention them several times in its papers for reasons that are unclear.  The Severance Agreement and PIIA are both unenforceable contracts since there was no consideration provided to Mr. Palmer for either of these contracts.  They were put in front of Mr. Palmer to sign on his way out the DCP door, after his termination. *See* Palmer Decl. ¶¶20-23.

than unfounded speculation, posited recklessly in order obtain an unwarranted injunction, and the speculation is wrong.  As discussed above, each of these communications was entirely proper and had no connection with any of DCP's confidential information or trade secrets.  *See supra,* Section A, 5-6.

Because DCP cannot show a likelihood of success on the merits of any claim relevant to an irreparable injury, its Motion should be denied for this reason as well.

**C.**     **The Balance Of Harm Favors The Defendants.**

As noted in Section A of this Memorandum, DCP has not demonstrated a likelihood that it will be subject to any harm if the injunction is denied.  On the other hand, Defendants would be subject to significant hardship if DCP's proposed injunction were issued.

DCP's proposed injunction states, among other things that, "Defendants .. . . shall not either directly or indirectly . . . communicate, divulge, or use . . . any trade secrets or confidential information, knowledge or know-how communicated or disclosed to them by DCP."  *See* ECF No. 2-10.  But the injunction fails to explain what is covered by terms "trade secrets," "confidential information," "knowledge" or "know-how."

DCP seems to be under the impression that any communication Mr. Palmer has automatically involves "confidential information" if it is with a current DCP client, or former DCP client, or any entity named on any target list ever created by DCP.  The threat of a contempt citation based upon such a sweeping and inclusive declaration would be paralyzing.  If DCP's interpretation of "confidential information" were accepted, Ascend's and Mr. Palmer's efforts to promote and pursue their new business together would be severely injured.

In essence, if DCP's proposed injunction is entered, Defendants will either have to risk a finding of contempt of court or shut down a substantial portion of their business.  This clearly presents a significant burden on Defendants, which far outweighs any harm demonstrated by DCP.

In its Motion, DCP argues that the court should summarily find the balance of harms favors DCP because Mr. Palmer in his Offer Letter "explicitly agreed" that injunctive relief would be available in the event of a breach of that agreement.  But as this Court has previously held, such clauses cannot be used as a "prop" to establish a plaintiff's irreparable harm that does not actually exist.  *Strobos v. RxBio, Inc.*, 221 F. Supp. 3d 21, 26 (D.D.C. 2016) (citing *Smith, Bucklin & Assos., Inc. v. Sonntag*, 83 F.3d 476, 481 (D.C. Cir. 1996) and *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1266 (10th Cir. 2004)).

For all these reasons, the balance of harms favors a denial of the Motion.

**D.**    **The Public Interest Weighs Against A Preliminary Injunction.**

The parties' underlying dispute in this action is a private matter that has little effect on the public at large.  However, it would be against the public interest to reward DCP for its conduct in bringing the instant Motion.

The public interest is furthered when plaintiffs act diligently and do not delay in bringing claims for injunctive relief.  *See, e.g., Benisek v. Lamone,* 138 S. Ct. 1942, 1944 (2018).  Further, considering this Court's view that preliminary injunction motions are emergency matters that require quick responses from defendants, it is particularly inappropriate for plaintiffs *in this Court* to drag their feet bringing their claims.  Likewise, to the extent a plaintiff is going to delay action to communicate with a defendant, the public interest is furthered when plaintiffs avail themselves of all opportunities to reduce the harm they would otherwise suffer before turning to the Court for injunctive relief.

As previously noted, Mr. Palmer's copying of the DCP Files occurred nearly a year ago, in December 2018.  Mr. Palmer offered to delete or return these files to DCP in April 2019; and then again in June 2019. DCP never accepted either offer; then filed the instant Motion on October 25, 2019, and served it on November 4, 2019.

In essence, DCP's Motion seeks emergency relief for a problem DCP could have solved entirely without court intervention. Moreover, even if intervention was necessary, the Motion could have been brought nearly a year ago. DCP has not even attempted to justify its conduct— likely because there is no reasonable explanation.

Because it is against the public interest to encourage the type of conduct displayed by DCP, the Court should deny the Motion on the public interest ground as well.

## CONCLUSION

When DCP first accused Mr. Palmer in March 2019 of taking and misusing confidential information, he immediately engaged counsel who notified DCP that the materials would be returned or deleted as DCP directed. After DCP failed to provide direction, Mr. Palmer asked again: did DCP want the materials returned or deleted? Again, DCP did not respond. Now, after ignoring Mr. Palmer's offers since April 2019, DCP has applied to the Court for emergency relief.

As an excuse for suddenly demanding quick and extraordinary relief, DCP provided a declaration that engages in false speculation about the source of information used by Mr. Palmer to pursue business with companies that are not, and have never been, clients of DCP. DCP's decision to: wait almost a year to bring this action; ignore Mr. Palmer's explicit willingness to return or delete the content; and then set forth a false narrative to portray him as a competitive threat he is not, should not be countenanced by the Court.

The Motion for Preliminary Injunction should be denied.

Dated: November 13, 2019         Respectfully submitted,

                                  _____/s/ Micah E. Ticatch_____
                                  R. Mark Dare, D.C. Bar No. 975759
                                  Micah E. Ticatch, D.C. Bar No. 1005398
                                  ISLER DARE, P.C.
                                  1945 Old Gallows Road, Suite 650
                                  Vienna, Virginia 22182

(703) 748-2690
(703) 748-2695 (fax)
mdare@islerdare.com
mticatch@islerdare.com

*Counsel for Douglas A. Palmer and Ascend Capital Group, LLC.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of November 2019, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

> Kevin T. Carroll
> Wiggin and Dana LLP
> 800 17th Street, Northwest, Suite 520
> Washington, DC 20006
> kcarroll@wiggin.com
> Phone:202-800-2475
> Facsimile: 212-551-2888
>
> *Counsel for Plaintiff*

/s/  *Micah E. Ticatch*
Micah E. Ticatch
